In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1515

MILWAUKEE DEPUTY SHERIFFS' ASSOCIATION,
itself and on behalf of its members,
MARK ZIDEK and ILIR SINO,

*Plaintiffs-Appellees*,

*v.*

DAVID A. CLARKE, JR., EDWARD BAILEY and
MILWAUKEE COUNTY,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 CV 0602—**Lynn Adelman**, *Judge*.

ARGUED SEPTEMBER 23, 2008—DECIDED DECEMBER 4, 2009

Before BAUER, CUDAHY, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* When the Milwaukee
County Sheriff invited a religious group to speak at the
Sheriff's department leadership conference, some officers
took offense to the Christian-focused presentation. And
when the Sheriff allowed the same group to speak at a

number of mandatory employee meetings, the officers complained. When the presentations continued, two Milwaukee County Sheriff's deputies, along with their union, sued under 18 U.S.C. § 1983, alleging a violation of the Establishment and Free Exercise Clauses of the First Amendment. The district court granted the plaintiffs' motion for summary judgment on their Establishment Clause claim, and the defendants appealed. Because the group's presentations during mandatory employee gatherings gave, at the least, the appearance of endorsement by the Sheriff's Department, we conclude that the defendants violated the Establishment Clause. Therefore, we affirm.

## I. BACKGROUND

In April 2006, the newly-formed Fellowship of the Christian Centurions ("the Centurions"), a peer support group created specifically for law enforcement officers, sent flyers to law enforcement agencies in the state of Wisconsin. The advertisement offered the officers an opportunity to discuss issues unique to them, but from a religious perspective. This included discussions on impacting others for Christ and on Christ's impact in their lives. The flyer's primary purpose, however, was to invite officers to the group's kickoff seminar, which featured then Milwaukee Police Chief Nannette Hegerty and former Green Bay Packer John Anderson.

The Centurions' mission left an impression on Milwaukee County Sheriff David Clarke, Jr. Upon receiving the flyer, he arranged a meeting with the group's founders,

George Papachristou, a former City of Milwaukee police officer, and Randy Melang, a lay minister. Sheriff Clarke and the group leaders met for over an hour, culminating with an invitation to address the officers in person.

The first presentation occurred at the Sheriff's department leadership conference. Attendance was mandatory for all deputies with the rank of Sergeant or above. The Sheriff spoke first. He announced that he would be making upcoming promotions to the rank of Captain and distributed written material that included a quotation from the Bible. The handouts listed the qualities a leader should look for in his inner circle—one of which was "people of faith." Approximately one hour after the Sheriff's speech, one of the Centurion organizers addressed the deputies with the following remarks:

> In a few minutes, George [Papachristou] will describe an [opportunity] coming up for police, parole and correctional [officers]. But first, I'd like to mention a few things for your consideration. *Whether or not we acknowledge it, each of us here today has a high calling and corresponding responsibility. Civil government was God's idea. The first several verses of Romans 13 tell us He established government and that people in authority are ministers of God assigned to promote good and punish evil.* The implied accountability is a sobering thought. Your task is unique in that society expects you to be a force for integrity, strength and justice; an officer who makes quick, correct analyses that lead to decisive actions. This can certainly be a catalyst for stress,

anxiety and introspection. You often see the worst of the human perspective. You're going to be critiqued everywhere from the kitchen table to radio talk shows. Being the least understood and experiencing a lack of support are probably commonplace. Being taken for granted is a given. How do you balance all this? Where do [you] gain strength and become refreshed; healed from scars that can go deep? Can you shut this all off and be a balanced parent and spouse? Or neighbor/friend? Grappling with enormous pressure while realizing that some level of evil plays a role in each of our lives can be discouraging, maybe defeating. *That's why Paul tells us in his letter to Timothy to pray for those in authority. I don't like to admit it but my life is fragile—the book of James tells us that life appears like a mist and it's gone. I'm not really the captain of my own ship. Fortunately, the same God who ordained authority inspired a book and sent a counselor that promises to give us guidance on how to navigate life's road.*

(emphasis added). Another Centurion affiliate distributed invitations to the organization's kickoff event at Elmbrook Church and made available copies of a book on Christian faith entitled "Putting the Pieces Back Together; How Real Life and Real Faith Connect."

   After the conference, the Sheriff arranged for additional presentations at the department roll calls. Roll calls are mandatory meetings that occur at the beginning of each work shift; all deputies scheduled for that work shift

are required to attend. Despite complaints from other employees, the Centurions made presentations during 16 roll calls between May 9 and May 16, 2006, during which they distributed the flyers and books featured at the leadership conference.

The plaintiffs, Ilir Sino (a Muslim) and Mark Zidek (a Catholic) were present during the roll call presentations and, together with their union, brought a § 1983 action against Sheriff Clarke and the Sheriff's Captain, Edward Bailey, in their official capacities, and Milwaukee County, alleging a violation of the Establishment Clause and the Free Exercise Clause of the First Amendment. The plaintiffs sought damages and an injunction to prevent future presentations from the Centurions at department events. Both sides filed motions for summary judgment. The district court granted the plaintiffs' motion as to their Establishment Clause claim and the defendants' motion as to the Free Exercise claim. The court also awarded $38,687.41 in attorneys' fees and one dollar in damages to each of the plaintiffs. The defendants now appeal.

## II.  ANALYSIS

### A.  The Establishment Clause Violation

The First Amendment to the United States Constitution, which is applicable to states through the Fourteenth Amendment, provides, in relevant part, that "Congress shall make no law respecting an establishment of religion . . . ." U.S. CONST. amend. I. This clause sets forth

a principle of government neutrality. It prohibits the government from promoting "a point of view in religious matters" or otherwise taking sides between "religion and religion or religion and nonreligion." *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (citations omitted). The Supreme Court set forth, in *Lemon v. Kurtzman*, a three-part test to evaluate Establishment Clause claims. 403 U.S. 602 (1971). Under the *Lemon* test, government action violates the Establishment Clause if it has any of the following characteristics: (1) a non-secular purpose; (2) the principal or primary effect of advancing or inhibiting religion; or (3) fostering an excessive government entanglement with religion. *Id.* at 612. The plaintiffs argue that the Sheriff's actions had the purpose or effect of advancing religion, so we focus our analysis on the first two elements.

The first prong of the *Lemon* test requires the plaintiff to demonstrate that the government's actual purpose was to endorse or disapprove of religion. *Books v. Elkhart County*, 401 F.3d 857, 863 (7th Cir. 2005). For this inquiry, we look through the eyes of an objective observer. *McCreary County*, 545 U.S. at 862. Although the government's articulation of a secular purpose is not sufficient to withstand First Amendment scrutiny, it is entitled to our deference "as long as it is not a sham." *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 771 (7th Cir. 2001). Furthermore, the Supreme Court has held that the government lacks a secular purpose under *Lemon* only when "there is no question that the statute or activity was motivated wholly by religious considerations." *Books*, 401 F.3d at 863 (quoting *Lynch v. Donnelly*,

465 U.S. 668, 680 (1984)). As the Court recognized in *McCreary*, the government does not generally act unconstitutionally with the predominant purpose of advancing religion. 545 U.S. at 863. And few cases have involved conduct or factual circumstances so patently religious as to be dispositive of the government's secular purpose.

The second prong of the *Lemon* test, however, requires no inquiry into the government's intent. The *appearance* of endorsement of religion alone can send a "message to nonadherents that they are outsiders, . . . and an accompanying message to adherents that they are insiders . . . ." *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring). Therefore, a government practice can also violate the Establishment Clause if a "reasonable person, apprised of the circumstances surrounding the [challenged government act], would conclude that [it] amounted to an endorsement of religion." *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 705 (7th Cir. 2005). The objective "reasonable person" in this test is presumed to be "informed . . . [and] familiar with the history of the government practice at issue." *Vasquez v. L.A. County*, 487 F.3d 1246, 1256 (9th Cir. 2007) (citation omitted).

Traditionally, outside organizations had limited access in disseminating information to the Sheriff's deputies. Most sent flyers to be posted on the bulletin board or read aloud to the officers. Very few organizations had been invited to make personal presentations, and such invitations had been limited to groups that partnered with the department in some form. For instance, Johnson's Bike Company, who also appeared at the conference,

supplied the department with bicycles, and Companions Rest, another invitee, donated money to the department's canine unit. Indeed, the Centurions also provided a benefit to the officers in the form of a support group. But their unique faith-based approach sets them apart from the secular organizations invited to speak. The Centurions offered peer support, but also sought to foster discussion on how the officers could "impact others for Christ" and on Christ's impact in their lives.

This presents a problem for the Sheriff because the Establishment Clause prohibits the government from "promot[ing] or affiliat[ing] itself with any religious doctrine or organization." *County of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989). During the Centurions' initial presentation at the leadership conference, Mr. Melang referenced Romans 13, from the Bible, which, according to him, "tell[s] us that [God] established government and that people in authority are ministers of God assigned to promote good and punish evil." He also stated that "the same God who ordained authority inspired a book and sent a counselor that promises to give us guidance on how to navigate life's road." Following the speech, the Centurions made available a book entitled "Putting the Pieces Back Together; How Real Life and Real Faith Connect." In light of the speaker's comments during the presentations, one can argue that the Sheriff should have taken affirmative steps to avoid the appearance of endorsement. *See Freedom from Religion Found. Inc. v. City of Marshfield*, 203 F.3d 487, 497 (7th Cir. 2000). Instead, he promoted this perception earlier in the conference when he circulated a handout in which he *under-*

*lined* "people of faith" as a quality leaders should look for when building their "inner circle." Notably, this occurred during a discussion on promotions to the rank of Captain.

The Sheriff's perceived or actual endorsement of the Centurions' message is readily apparent from these facts. The Supreme Court's decision in *Santa Fe Independent School District v. Doe* presents a useful analogy. 530 U.S. 290 (2000). In determining that an invocation delivered before a football game created the perception of endorsement by the school, the Court in that case looked to the following factors: the invocation was "delivered to a large audience assembled as part of a *regularly scheduled, school-sponsored function* conducted on school property"; "the pregame ceremony [was] clothed in the traditional indicia of school sporting events . . . "; and the crowd included many who displayed the school colors and insignia. *Id.* at 307-08 (emphasis added). Based on these observations and others, the Court concluded that "members of the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administrator." *Id.* at 308. In contrast, in *Good News Club v. Milford Central School*, the Court focused on the government's neutrality, as other groups had access to the school, and the religious club's meetings were held after school hours, were not sponsored by the school and were open to the public, in concluding that the Establishment Clause did not require the school to exclude the religious organization from its property. 533 U.S. 98, 113 (2001).

Although the above examples concern cases applying the First Amendment in the school context, they provide useful illustrations of what a reasonable person would perceive to be endorsement. In this case, the Centurions gave a heavily Christian-focused presentation at a mandatory conference for government employees, and the Sheriff subsequently invited them to present at mandatory roll calls during work hours, granting them unfiltered access to a captive audience of subordinates. At each roll call, they were personally introduced by the Sheriff's command staff and were permitted to distribute additional Christian-focused literature. Even more telling was the Sheriff's refusal to cease the presentations after some of the deputies complained of the Centurions' proselytizing. He took no steps to disentangle himself or the Department from any of the religious messages, *see Santa Fe*, 530 U.S. at 306, and his actions, at the least, appeared to place the Centurions' in the same category as the other "partnering" organizations, like Johnson's Bike Company—all of whom presumably received the Department's approval.

We do not suggest, however, that religiously affiliated groups are always constitutionally barred from working with or speaking to government employees. Rather, we limit our analysis to the facts of this case, where an authority figure invited a Christian organization that engaged in religious proselytizing to speak on numerous occasions at mandatory government employee meetings. A reasonable observer would have been well aware that the Sheriff did not extend such privileges lightly. Most other organizations that received similar

access shared a common attribute: the Sheriff had expressed an interest in partnering with them.[1] Indeed, it would be difficult to interpret the Sheriff's actions as anything other than endorsement.

### B. First Amendment Did Not Compel Access

The Sheriff, nonetheless, argues that the Free Speech Clause of the First Amendment compelled him to grant access to the Centurions.[2] He contends that, by allowing the presence of other support groups such as the Alliance for Blacks in Law Enforcement and the National Latino Peace Officers Association, the department has created a nonpublic forum in its leadership conference and roll calls. He argues that the Centurions offer deputies the same support, but from a religious viewpoint. As

---

[1] Among the other organizations invited to speak were: the Alliance for Blacks in Law Enforcement, United Performing Arts Fund, Big Brothers and Big Sisters, the United States Marine Corps, the National Latino Peace Officers Association, the United Way, and the Child Abuse Prevention Fund.

[2] The Sheriff suggests that he is making a Free Exercise challenge. Brief of Defendants-Appellants at 12. However, their actual arguments invoke the Free Speech clause of the First Amendment, and we analyze it as such here. There is no Free Exercise issue. Refusing to allow the Centurions to present to the Sheriff and his deputies places no burden on the Centurions' exercise of religion. *Locke v. Davey*, 504 U.S. 712, 720 (2004); *Vision Church v. Vill. of Long Grove*, 458 F.3d 975, 996 (7th Cir. 2006).

such, the Sheriff believes he could not have constitutionally denied the Centurions the opportunity to present based on their religious viewpoint.

Under a Free Speech forum analysis, the forum category defines the level of scrutiny applicable to the challenged government action. *Good News Club*, 533 U.S. at 106; *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008). The traditional public forum is a public space (such as a street or a park) that has long been used and open for expressive activity. *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983). A designated public forum refers to property or mediums of communication that, although not traditionally open to the public, have been opened for public discourse. *Choose Life*, 547 F.3d at 864. The government's exclusion of a speaker in traditional or designated public fora is subject to strict scrutiny, meaning that the exclusion must be necessary to serve a compelling state interest and must be narrowly tailored to achieve that interest. *Id.* The third category, the nonpublic forum, refers to all other government property. There, the government can reserve its space for certain groups or for the discussion of certain topics. *Good News Club*, 533 U.S. at 106. Exclusion from nonpublic fora is permitted subject to two conditions: the government cannot engage in viewpoint discrimination against speech otherwise within the forum's limitations, and the restriction must be reasonable in light of the purpose served by the forum. *Id.* at 106-07 (quotations omitted).

The Sheriff is mistaken that the department has created a forum of any kind and so, the Centurion's desire to

access the deputies present at the leadership conference and roll calls does not trigger a Free Speech forum analysis. The Supreme Court recognizes a distinction between claims asserting access to a forum and claims asserting access to a captive audience. *Minn. State Bd. for Cmty Coll. v. Knight*, 465 U.S. 271, 286 (1984). In *Knight*, a group of college faculty wished to share its policy views with the state by accessing the specific employee representatives from whom the state took advice. The Supreme Court held that the forum analysis was not applicable because the faculty asserted an entitlement to a government audience, rather than the physical space in which to speak. *Id.* at 286. Likewise, in *Berger v. Rensselaer Central School Corp.*, we found the forum analysis not applicable to a Christian organization who sought permission to distribute Bibles at a local elementary school. 982 F.2d 1160 (7th Cir. 1993). We recognized that the organization sought access to the children (the audience) and not the facilities. *Id.* at 1165. This is equally true here. The Centurions' real desire is not to access a public space in which to hold their meetings; their interest lies in accessing the Sheriff's deputies as an audience.

Furthermore, the Sheriff's invitation to the Centurions and other organizations does not create a forum of any kind. The Sheriff invited organizations with which it wished to partner, and the government may do so without creating an open forum. *See, e.g.*, *Greer v. Spock*, 424 U.S. 828, 838 n.10 (1976) ("The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to

convert Fort Dix into a public forum . . . ."); *May v. Evansville Vanderburgh Sch. Dist.*, 787 F.2d 1105, 1113 (7th Cir. 2007) ("A classroom does not become a public forum because a guest lecturer from the outside is invited to talk to the class."). The Centurions, on whose behalf the Sheriff makes this argument, have no constitutional right to impose their views upon a government audience. We therefore reject the Sheriff's attempts to seek refuge under the Free Speech Clause; it does not create a constitutional obligation for the Sheriff to allow the religious proselytizing that occurred here.

### III.  CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.