In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-3738

KEVIN W. CULP, *et al.*,

*Plaintiffs-Appellants*,

*v.*

LISA MADIGAN, in her official capacity as Attorney General of Illinois, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:14-CV-03320 — **Sue E. Myerscough**, *Judge*.

———————————

ARGUED SEPTEMBER 22, 2016 — DECIDED OCTOBER 20, 2016

———————————

Before BAUER, POSNER, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. Illinois' Concealed Carry Act, 430 ILCS 66/1 *et seq.*, authorizes an Illinois resident to carry, on his person or next to him in a car, a loaded or unloaded firearm as long as it is fully or partially concealed and he (or she) meets the qualifications set forth in the Act. We held in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), that the Second Amendment entitles qualified persons to carry guns

outside the home; just a few months ago we said that "the constitutional right to 'keep and bear' arms means that states must permit law-abiding and mentally healthy persons to carry loaded weapons in public." *Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 845 (2016). But "qualified," "law-abiding," and "mentally healthy" are significant limitations on the right of concealed carry.

The qualifications in the Act are numerous but to decide this case we need consider only a few of them: that the applicant for a concealed-carry license not present a clear and present danger to himself or others or a threat to public safety and not in the last five years have been a patient in a mental hospital, or been convicted of a misdemeanor involving the use or threat of physical force or violence, or been in a residential or court-ordered drug or alcohol treatment program, or have committed two or more violations involving driving under the influence of drugs or alcohol, or be subject to a legal proceeding that could lead to being disqualified to possess a gun. 430 ILCS 66/25, 65/4(a)(2)(iv).

In compliance with *Moore v. Madigan*, *supra*, Illinois has authorized residents of Illinois who meet the criteria listed above to obtain concealed-carry licenses. But what about a nonresident of Illinois? Can he or she obtain a right to carry a concealed firearm in Illinois? Yes, but only if he resides in a state or territory that has "laws related to firearm ownership, possession, and carrying, that are substantially similar to the requirements to obtain" an Illinois concealed-carry license, and submits a notarized statement confirming that he is eligible under both federal law and the laws of his home state to own a gun and licensed by that state to carry a gun. 430 ILCS 66/40(b), 66/40(c)(2). A state's gun laws are deemed

"substantially similar" to Illinois' if the state does the following four things:

1. "regulates who may carry firearms, concealed or otherwise, in public;"

2. "prohibits all who have involuntary mental health admissions, and those with voluntary admissions within the past 5 years, from carrying firearms, concealed or otherwise, in public;"

3. "reports denied persons to NICS [National Instant Criminal Background Check System];" and

4. "participates in reporting persons authorized to carry firearms, concealed or otherwise, in public through NLETs [National Law Enforcement Telecommunications System]."

20 Ill. Admin. Code 1231.10. As we'll see, these four requirements are not imposed in order to punish nonresidents because of where they live or because Illinois disapproves of other states' gun regimes. The sole purpose is to protect Illinois residents. The Illinois State Police determines which states make the cut by conducting a fifty-state survey and posting the results on its website. 20 Ill. Admin. Code 1231.110(b), (c). Currently only Hawaii, New Mexico, South Carolina, and Virginia qualify as "substantially similar" in the relevant respects to Illinois. Illinois State Police Firearm Services Bureau, "Frequently Asked Questions: How can I find out if my state's laws are considered 'substantially similar?'" www.ispfsb.com/Public/Faq.aspx (visited Oct. 19, 2016).

Illinois recognizes certain exceptions for citizens of not "substantially similar" states. A person who has a firearm

license from his own state is allowed to carry a firearm in Illinois while hunting or at a firing range or on property whose owner permits him to carry a gun, 430 ILCS 65/2(a), (b), and if he has a concealed-carry license from his state he can transport a firearm in his car or other vehicle in Illinois as long as he doesn't remove it from the vehicle. 430 ILCS 66/40(e).

The plaintiffs in this case, nonresidents of Illinois each of whom has a concealed-carry license from his home state, travel to Illinois whether on business or for family or other reasons and want, while they are in Illinois, to be allowed to carry a firearm even if they are not within the exceptions to the restrictions on nonresident gun carrying just listed, but are not allowed to do so because they aren't residents of states that have firearm laws substantially similar to Illinois'. They argue that Illinois' refusal to issue concealed-carry licenses to them violates Article IV of, and the Second and Fourteenth Amendments to, the Constitution. The district judge declined to issue a preliminary injunction, precipitating this appeal.

The plaintiffs' claim to be allowed to carry concealed firearms when they are visiting Illinois would be compelling if the Illinois authorities could reliably determine whether in fact a nonresident applicant for an Illinois concealed-carry license had all the qualifications that Illinois, or states that have concealed-carry laws substantially similar to Illinois, require be met. But while the Illinois state police have ready access to information about Illinois residents (mainly about whether the applicant for a concealed-carry license has a criminal history or a history of mental illness) that is necessary to determine whether an applicant is eligible to obtain

such a license, they lack reliable access to the information they need about the qualifications of nonresident applicants other than residents of the four "substantially similar" states.

An uncontradicted affidavit from Jessica Trame, the chief of the Illinois Firearms Services Bureau, lists information sources that the Bureau relies on in determining whether an applicant for a concealed-carry license is eligible. They include records of drivers' licenses and a computerized criminal history records system. There is also the federal database of criminal histories mentioned earlier (NLETS) that the police can access, but it is incomplete because many states submit incomplete information on their arrest and prosecution records to the database. And while the Illinois Bureau can request information from local jurisdictions (cities, counties, etc.) in other states, those jurisdictions charge for the information; and the Bureau claims without contradiction that it lacks the funds required to pay the charges (Illinois state agencies are notoriously underfunded). The Bureau has for example encountered significant difficulties in its efforts to obtain mental health information about residents of other states; many of those states don't track such information.

But it's not just the initial application process that has Illinois concerned. Illinois needs reliable information in order to be able to monitor the holders of gun permits, which are good for five years. 430 ILCS 66/50, 66/35. So after issuing a concealed carry license Illinois checks its own databases daily and national ones quarterly for updates that might require a license to be revoked. But it is unable to obtain updates from states that don't track or report the information. This

practical need explains all four of the requirements for "substantially similar" gun laws listed above.

All this said, the plaintiffs do make some apt criticisms of the Illinois law. They point out for example that the concealed-carry license of an Illinois resident is not revoked or reassessed if he returns from a trip to, or a sojourn in, another state, even though the Illinois authorities will not know what he did in that state—whether for example he committed a crime or had a mental breakdown. And anyone who lives in Illinois or one of the four substantially similar states is eligible to obtain an Illinois concealed-carry license even if he had become a resident of such a state recently, having spent many years living in dissimilar and therefore non-approved states, with Illinois (and, presumably, the substantially similar state as well) unable to obtain information about his possible criminal or mental problems in those states.

So the Illinois law regulating the concealed-carry rights of nonresidents is imperfect. But we cannot say that it is unreasonable, so imperfect as to justify the issuance of a preliminary injunction. Cf. *Moore v. Madigan*, *supra*, at 940. The critical problem presented by the plaintiffs' demand—for which they offer no solution—is verification. A nonresident's application for an Illinois concealed-carry license cannot be taken at face value. The assertions in it must be verified. And Illinois needs to receive reliable updates in order to confirm that license-holders remain qualified during the five-year term of the license. Yet its ability to verify is extremely limited unless the nonresident lives in one of the four states that have concealed-carry laws similar to Illinois' law. A trial in this case may cast the facts in a different light,

but the plaintiffs have not made a case for a preliminary injunction.

AFFIRMED

MANION, *Circuit Judge*, dissenting. Just four years ago, this court invalidated Illinois' decades-old blanket ban on the carrying of firearms in public. *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). We recognized that the Second Amendment requires states to "permit law-abiding and mentally healthy persons to carry loaded weapons in public." *Berron v. Ill. Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 845 (7th Cir. 2016). It was only in response to our decision in *Moore* that Illinois finally became the last state in the nation to enact a concealed-carry law.

Although Illinois now reluctantly allows its residents to carry concealed weapons with a license, it still significantly restricts the rights of nonresidents to do so. State law prevents the residents of 45 states from even applying for an Illinois concealed-carry license because the Department of State Police has not classified their states' public-carry qualifications as "substantially similar" to those Illinois imposes. These nonresidents, including the plaintiffs in this case, have no opportunity to prove that they meet Illinois' requirements. Based solely on their states of residence, they are deprived of any opportunity to exercise their Second Amendment rights in Illinois.

When a state law infringes on the fundamental Second Amendment right to keep and bear arms for self-defense, it must satisfy heightened scrutiny. Our precedents instruct that to sustain such a law, a state must present "an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011). Illinois has not done so here. As explained below, the state's chosen method to regulate non-

resident concealed-carry license applications is not suffi-
ciently tailored to its goal of properly vetting out-of-state ap-
plicants' criminal and mental histories. Therefore, the ban vi-
olates the Second Amendment.

Nevertheless, the court holds that the plaintiffs are not en-
titled to preliminary relief because the application ban is not
"unreasonable." The court's application of rational-basis re-
view to the nonresident application ban is directly contrary to
Supreme Court and Seventh Circuit precedent. Under the
proper standard of review, the plaintiffs are certain to succeed
on the merits of their Second Amendment claim.[1] I would re-
verse the district court's judgment and remand with instruc-
tions to issue a preliminary injunction. I respectfully dissent.

## I. Background

Illinois law requires the Department of State Police to issue
a concealed-carry license to each Illinois resident who applies
and meets certain qualifications. 430 ILCS 66/25. The Depart-
ment must also issue a license to some nonresidents who meet
all of these qualifications other than Illinois residency. 430
ILCS 66/40(b). Under the statute, the Department may only
process applications from residents of states "with laws re-
lated to firearm ownership, possession, and carrying, that are
substantially similar to the requirements to obtain a license

---

[1] The parties indicated at oral argument that the record before us now
is the same one that is before the district court for the pending summary
judgment motion. Therefore, there is no need to hedge on the plaintiffs'
likelihood of success at this stage. The result will not change should this
case return on appeal from the grant of the state's motion for summary
judgment. That is why I would hold that the plaintiffs are certain to suc-
ceed on the merits.

under [Illinois law]." *Id.* The definition of "substantially similar" is left to the Department's discretion.

Department regulations define "substantially similar" states as those that do all of the following: (1) regulate who may carry firearms in public; (2) prohibit all who have had involuntary mental health admissions, and those who have had voluntary admissions in the past five years, from carrying firearms; (3) report denied persons to the National Instant Criminal Background Check System; and (4) participate in reporting those authorized to carry through the National Law Enforcement Telecommunications System. Ill. Admin. Code 1231.10. The Department periodically sends a survey to each state to determine whether it meets these criteria. At present, the Department has identified only Hawaii, New Mexico, Virginia, and South Carolina as "substantially similar" states.[2] The law therefore operates as a total ban on concealed-carry license applications from residents of the other 45 states.

The individual plaintiffs are law-abiding nonresidents who hold concealed-carry licenses in their resident states. Some are even certified Illinois concealed-carry instructors. They wish to apply to carry firearms in Illinois. The plaintiffs contend that the ban on applications from their states violates the Second Amendment, the Equal Protection Clause, the Due Process Clause, and the Privileges and Immunities Clause of

---

[2] The Department sent the surveys that identified the four currently approved states in 2013. At that time, seven states did not respond at all to Illinois' survey. Illinois indicated at oral argument that it recently sent another survey and that the Department is currently analyzing the results. The list of approved states is subject to change based upon the results of this most recent survey.

Article IV. The district court denied their motion for a preliminary injunction, and the plaintiffs timely appealed.

## II. Discussion

### A. Preliminary Injunction Standard

To determine whether the plaintiffs are entitled to preliminary relief, this court applies a two-part "sliding scale" test. As a threshold matter, the movants must establish (1) some probability of success on the merits; (2) lack of an adequate remedy at law; and (3) irreparable harm in the absence of an injunction. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). If they clear that hurdle, the district court then must balance the harms that both parties would suffer in the event of an adverse decision. In this analysis, it must consider the public interest in granting or denying an injunction and weigh the threshold factors against each other, depending on how strongly each factor points in favor of each party. *See id.* We generally review the district court's legal analysis *de novo* and its balancing of the factors for abuse of discretion. *Id.* However, "a decision to deny a preliminary injunction that is premised on an error of law is entitled to no deference and must be reversed." *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO*, 243 F.3d 349, 361 (7th Cir. 2001).

**B. Likelihood of Success on the Merits**

At this stage, the principal issue is whether the plaintiffs are likely to succeed on the merits of their Second Amendment claim.[3] The "sliding-scale" nature of the preliminary injunction inquiry means that the plaintiffs' precise chances of success are highly relevant to whether an injunction should issue. A movant with just a slight chance of success must make a much greater showing of harm than one who is certain to prevail. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994).

As with any constitutional case, the strength of the plaintiffs' Second Amendment claim depends upon two things: (1) which standard of means-ends scrutiny applies to the claim; and (2) whether the evidence is sufficient to sustain the challenged law under the chosen scrutiny. I will address these in turn.

### 1. Proper Standard of Review

The Supreme Court has recognized that "the Second Amendment secures a pre-existing natural right to keep and bear arms." *Ezell*, 651 F.3d at 700 (citing *District of Columbia v. Heller*, 554 U.S. 570, 595, 599–600 (2008)). "[I]ndividual self-defense is 'the *central component*' of the Second Amendment right," which is fundamental and therefore enforceable against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010) (quoting *Heller*, 554 U.S. at 599). We have held that the right to bear arms for self-defense "is as important outside the home as inside." *Moore*, 702 F.3d at 942. Illinois

---

[3] Because I conclude that the plaintiffs' Second Amendment claim is certain to succeed on the merits, I do not address their remaining constitutional challenges to the Illinois statute.

recognizes that holding and correctly concedes that the non-resident application ban implicates the Second Amendment. The dispute centers on the proper standard of review.

In *Heller*, the Supreme Court did not resolve this question for all future Second Amendment claims. However, it made it abundantly clear that rational-basis review is inappropriate where a law affects Second Amendment rights. *Heller*, 554 U.S. at 628–29 & n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Because of *Heller* and *McDonald*, this court is by default "left to choose an appropriate standard of review from among the heightened standards of scrutiny the [Supreme] Court applies to governmental actions alleged to infringe enumerated constitutional rights." *Ezell*, 651 F.3d at 703.

Our precedents instruct that this critical choice should depend on two factors: "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* Since *Heller* rules out rational-basis review, we must apply either intermediate scrutiny, strict scrutiny, or another form of heightened scrutiny in between those standards. Intermediate scrutiny generally requires the government to show that the challenged law is "substantially related to an important government objective" *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc), while under strict scrutiny the government must prove that the law is "necessary to serve a compelling state interest" and "narrowly tailored to achieve that interest." *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 530 (7th Cir. 2009).

Three recent Second Amendment cases are particularly relevant to the standard of review question. First, in *Skoien*, we considered the constitutionality of the federal ban on the possession of firearms by those convicted of misdemeanor domestic violence. There, rather than enter "deeply into the 'levels of scrutiny' quagmire," the *en banc* court simply accepted the government's concession that intermediate scrutiny applied to the ban. *Id.* at 641–42. It held that "logic and data establish a substantial relationship" between the statute and the goal of "preventing armed mayhem." *Id.* at 642.

In *Ezell*, the plaintiffs sought a preliminary injunction against Chicago's ban on firing ranges. We described the firing-range ban as "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Ezell*, 651 F.3d at 708. Critically, unlike the criminal defendant in *Skoien*, the *Ezell* plaintiffs were "the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*." *Id.* Because Chicago's law reached close to the core of the Second Amendment and curtailed the rights of law-abiding citizens, we required "a more rigorous showing than that applied in *Skoien* … if not quite 'strict scrutiny.'" *Id.* Under this standard, the city had to demonstrate "a strong public interest justification for its ban" and "a close fit between the range ban and the actual public interest it serves." *Id.* at 708–09. Chicago failed to carry that burden, significantly because it could not show that its public safety interest could not be "addressed through sensible zoning and other appropriately tailored regulations." *Id.* at 709.

Finally, we have *Moore*. In that case, we applied *Ezell*-like scrutiny to invalidate Illinois' blanket ban on the public carrying of firearms. *Moore*, 702 F.3d at 940 (categorizing the level of scrutiny as "a stronger showing" than required in *Skoien*). We explained that, because the ban on concealed-carry curtailed "the gun rights of the entire law-abiding population of Illinois," as opposed to a small group of people convicted of domestic violence, intermediate scrutiny was insufficient. *Id.* As we put it then, "so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would." *Id.* Like Chicago's firing range ban, Illinois' total prohibition on concealed-carry could not withstand such scrutiny. *See id.* at 939 ("If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.").

These cases establish the basic principles that govern the present dispute. Whenever a law infringes on the right to bear arms for self-defense, that law must be at least substantially related to an important government interest. And a law that curtails the fundamental right of law-abiding citizens to carry a weapon for self-defense must pass even more exacting (although not quite strict) scrutiny. Defenders of such a law must show a "close fit" between the law and a strong public interest. *Ezell*, 651 F.3d 708–09. That "close fit" is functionally equivalent to the "narrow tailoring" requirement for content-neutral speech restrictions to which strict scrutiny is inapplicable. *See, e.g., McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014); *see also Ezell*, 651 F.3d at 706–08 (discussing the adaptation of

First Amendment precedent to Second Amendment cases).
As in First Amendment cases, the tailoring requirement pre-
vents government from striking the wrong balance between
efficiency and the exercise of an enumerated constitutional
right. *McCullen*, 134 S. Ct. at 2534.

Just as in *Ezell* and *Moore*, the plaintiffs in this case are pre-
cisely the type of law-abiding citizens "whose Second
Amendment rights are entitled to full solicitude under *Hel-
ler*." *Ezell*, 651 F.3d at 708. What is more, the nonresident ap-
plication ban functions as a categorical prohibition of applica-
tions from the majority of Americans. It is therefore a severe
burden on the recognized Second Amendment right. Indeed,
Illinois' application ban has the potential to affect even more
people than did the sweeping restrictions we invalidated in
*Moore* and *Ezell*. Therefore, it must satisfy the same exacting
scrutiny that we applied in those cases.

In sum, "a ban as broad as Illinois' can't be upheld merely
on the ground that it's not irrational." *Moore*, 702 F.3d at 939.
The court's cursory application of rational-basis review is di-
rectly contrary to Supreme Court and Seventh Circuit prece-
dent. As a result, the court adds confusion to our case law and
allows the states impermissible latitude to violate the Second
Amendment rights of law-abiding Americans.

### 2. Application of *Ezell* Scrutiny

Having established the appropriate standard of review, I
now turn to its application in this case. Illinois submits that
the prohibition of so many nonresident applications is neces-
sary because the state can properly vet only applicants from
Illinois and the four Department-approved states. Illinois says

that it cannot afford to pay to access information, such as applicants' criminal records, from jurisdictions that do not report to the national databases Illinois uses to look up those records. Moreover, some states do not track mental health information at all. According to Illinois, it cannot obtain mental health records for potential applicants from many states and thus cannot evaluate whether applicants from these states are qualified under Illinois law to carry a firearm.

The plaintiffs do not challenge Illinois' power to maintain a licensing scheme with some conditions on the right to carry a firearm in public. *See Berron*, 825 F.3d at 847. Nor do they challenge the conditions themselves. On the contrary, they *want the opportunity to comply* with those conditions. They seek the opportunity to be treated the same way Illinois treats its own residents and those of the four Department-approved states. The current statutory scheme deprives them of that opportunity.

Since the court erroneously subjects the application ban only to rationality review, it fails to answer the dispositive question. Namely, is the ban is sufficiently tailored to Illinois' interest in vetting applicants to pass *Ezell* scrutiny? I would hold that it is not. The court seemingly admits that the law is significantly underinclusive (because it regulates too few people to be effective in addressing the stated goal) and overinclusive (because it regulates too many people that do not fall under its public interest justification). These features, which the court concedes make the law "imperfect," suffice to demonstrate that the required close fit between means and ends is lacking. *Cf. Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 232 (1987) (holding that regulations fail narrow-tailoring

analysis when they are both overinclusive and underinclusive).

The nonresident application ban is significantly underinclusive in two principal ways. First, as the court correctly notes, "the concealed-carry license of an Illinois resident is not revoked or reassessed if he returns from a trip to … another state, even though the Illinois authorities will not know what he did in that state—whether for example he committed a crime or had a mental breakdown." Maj. Op. at 6. Second, a potential applicant who moves to one of the four approved states becomes immediately eligible to apply for an Illinois concealed-carry license. This is true "even if he had become a resident of such a state recently, having spent many years living in dissimilar and therefore non-approved states, with Illinois (and, presumably, the substantially similar state as well) unable to obtain information about his possible criminal or mental problems in those states." *Id.* As broad as the application ban is, it does not allow Illinois to vet potential licenseholders or future applicants in two quite plausible situations. This severely undercuts Illinois' justification for maintaining it.[4] *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417–18 (1993) (ban on news racks containing "commercial handbills" lacked the required "reasonable fit" between the government's asserted end and the means chosen because it was woefully underinclusive).

---

[4] Moreover, Illinois law already permits nonresidents who hold firearm licenses from their resident states to possess a gun in various other ways in Illinois. See Maj. Op. at 3–4. The fact that Illinois trusts nonresidents to bring guns into the state to use on firing ranges or simply to carry in a vehicle undermines its policy rationale for restricting these same people from applying to carry a concealed weapon.

The ban is also overinclusive. While a categorical applica-
tion ban no doubt prevents many disqualified people from
obtaining an Illinois concealed-carry license,[5] it also prohibits
many who would meet Illinois' qualifications from applying
for a license. The plaintiffs in this case are exemplary. All are
responsible gun owners with significant firearm training, no
criminal or mental histories, and valid concealed-carry li-
censes from other states. Plaintiffs Kevin Culp, Douglas Zyl-
stra, and Paul Heslin are Illinois-certified concealed-carry in-
structors who hold carry licenses in multiple states. A law that
prevents an Illinois-licensed concealed-carry instructor from
even *applying* for a license to carry in that state sweeps up far
too many people to be appropriately tailored under any ex-
acting standard of scrutiny.

Once more, it is important to emphasize that the plaintiffs
seek only the right to apply for a concealed-carry license.
Should they prevail, they would gain only the ability to seek
a license on the same basis as residents of Illinois and the four
Department-approved states. While such a process may im-
pose an additional burden, Illinois has not shown that it

---

[5] While I do not doubt the statute's effectiveness at preventing these
people from obtaining a license, whether it actually prevents gun violence
is another matter altogether. In *Moore,* we properly recognized that "[t]he
available data about permit holders … imply that they are at fairly low
risk of misusing guns, consistent with the relatively low arrest rates ob-
served to date for permit holders." *Moore,* 702 F.3d at 937–38 (quoting
Philip J. Cook, et al., *Gun Control After* Heller: *Threats and Sideshows from a
Social Welfare Perspective,* 56 UCLA L. Rev. 1041, 1082 (2009)). There is no
indication that this is any less true for concealed-carry license holders in
one state who wish to apply for a license in another state. To put it plainly,
it is unlikely that someone wanting to commit a gun crime in Illinois will
first avail himself of the licensing process for out-of-state residents.

would be impossible, or even impractical, for these out-of-state applicants to provide verified records that satisfy Illinois' requirements. For instance, nonresidents could attempt to shoulder the burden of paying for criminal record searches in their resident state and providing the relevant records to Illinois. Prospective applicants could also seek certification that they satisfy Illinois' mental health requirement. In many cases, such certification would provide Illinois with more information than it can obtain about its own residents' out-of-state sojourns, which they admittedly cannot track.[6] Potential applicants should at least be given that chance.

In sum, the absolute denial of nonresidents' right to apply for an Illinois concealed-carry license lacks the required close fit to the state's asserted interest in properly vetting applicants. It is woefully overinclusive *and* underinclusive relative to that aim. Therefore, 430 ILCS 66/40(b) violates the plaintiffs' Second Amendment rights. I would hold that the plaintiffs are certain to succeed on the merits.

## C. Remaining Preliminary Injunction Factors

Because I would hold that the plaintiffs are certain to succeed, I must proceed to the remaining preliminary injunction factors. In addition to demonstrating some probability of success on the merits, the plaintiffs must establish that they

---

[6] For example, there is no reason that Illinois cannot require nonresident applicants to submit their health records as proof that they have not been treated for a mental illness. The state could also require an affidavit from a treating physician certifying an applicant's lack of mental admissions. This information would be far more valuable to Illinois than the simple fact that an applicant has a Hawaii concealed-carry license. After all, there is no guarantee that Hawaii was aware of its applicants' mental health admissions in other states before granting licenses.

would be "irreparably harmed if [they do] not receive preliminary relief, and that money damages and/or an injunction ordered at final judgment would not rectify that harm." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). The district court properly found that the plaintiffs satisfy all of the threshold requirements here. *See Ezell*, 651 F.3d at 697–99 (holding that irreparable harm is presumed in Second Amendment cases and that damages could not compensate for a violation). I need not belabor these points.

More critical is the district court's balancing of the harms. Although the district court correctly concluded that the plaintiffs met all the threshold requirements for an injunction, it still denied their motion based on its conclusion that issuance of an injunction would harm the state more than a failure to issue one would harm the plaintiffs. The district court reasoned that the state would be harmed by its inability to conduct background checks on newly eligible applicants, while the plaintiffs could carry guns into Illinois for various other purposes and retained the right to concealed-carry in their resident states even in the absence of an injunction.

Because it was premised on an error of law, the district court's balancing of the factors is due no deference. *United Air Lines*, 243 F.3d at 361. Since the district court erred by applying only intermediate scrutiny to the plaintiffs' Second Amendment claim, it erroneously concluded that the plaintiffs' claim was "neither strong nor weak." Had it applied the proper standard of review and held that the plaintiffs are certain to succeed, the district court would have required a much weaker showing of harm before it issued the injunction. *Storck*

*USA*, 14 F.3d at 314 ("[T]he greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor.").

Given the plaintiffs' certainty of success, I would hold that the balance of harms tips in their favor. Simply permitting law-abiding citizens who have concealed-carry licenses in other states to apply for an Illinois license will not irreparably harm the state. Illinois may still deny those who do not meet its stringent criteria, so an injunction will not result in a flood of new concealed-carry license-holders. Meanwhile, the plaintiffs suffer irreparable harm each day they cannot avail themselves of Illinois' concealed-carry licensing scheme. *See Ezell*, 651 F.3d at 699 ("If they're right [on the merits], then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books."). The fact that they can still possess firearms in other limited ways in Illinois and exercise the right to carry a firearm in their home states is irrelevant. *Id.* at 697-98. The application ban prevents them from taking the first step towards exercising their fundamental constitutional rights in Illinois.

### III. Conclusion

Today's decision will have a profound and unfortunate impact on the scope of Second Amendment rights in our circuit. The court's decision has unnecessarily muddied the waters and cast significant doubt upon our holdings in *Ezell* and *Moore*. Rather than create confusion, we should reaffirm that state laws affecting the fundamental right to carry a firearm for self-defense are subject to exacting scrutiny. Under this standard, the plaintiffs are entitled to a preliminary injunction. I respectfully dissent.