In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-3264

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMISON L. KRAHENBUHL,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 21-cr-00127 — **William C. Griesbach**, *Judge.*

———————————

ARGUED SEPTEMBER 27, 2023 — DECIDED DECEMBER 14, 2023

———————————

Before SYKES, *Chief Judge*, and FLAUM and LEE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Seeking to defend veterans' right to express discontent with treatment received at VA medical centers, Jamison Krahenbuhl appeals his disorderly conduct convictions. First, he protests that his convictions violate the Constitution because he has a First Amendment right to shout profanity at medical workers and police at the VA Clinic. Second, he argues that the government failed to prove all the

elements of the crimes. For the reasons that follow, we affirm Krahenbuhl's convictions.

## I.    Background

### A.  Factual Background

In March of 2021, Krahenbuhl, an Air Force veteran, went to the Milo C. Huempfner Veterans Affairs Outpatient Clinic in Green Bay, Wisconsin for a respiratory therapy appointment.[1] During his appointment, Krahenbuhl became agitated when respiratory therapist, Tiffany Mueller, informed him that based on test results he did not appear to have sleep apnea.

Krahenbuhl slammed his fists on the table between them and, in a raised voice, asked Mueller "who the fuck [she was]" to make that determination. Another VA respiratory therapist, Julie Malchak, overheard the commotion and, fearing for Mueller's safety, activated a silent alarm to summon VA police. Meanwhile, Mueller asked Krahenbuhl to leave. He continued to yell as Mueller walked him back to the patient waiting area.

Officer Daniel St. Amour, investigating the silent alarm, encountered Krahenbuhl near the Patient Advocate Office. He described Krahenbuhl as walking "very intently" with a "thousand-yard stare" and looking "very upset." When St. Amour attempted to speak with Krahenbuhl, Krahenbuhl told him to "fuck off." Finding no one at the Patient Advocate

---

[1] Because Krahenbuhl challenges the sufficiency of the evidence, we relay the facts in the light most favorable to the government. *United States v. York*, 48 F.4th 494, 499 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 1772 (2023).

Office available to help him, Krahenbuhl headed toward the exit. St. Amour attempted to speak with him again and was rebuffed by another round of expletives as Krahenbuhl exited the Clinic. Outside, St. Amour placed his hand on Krahenbuhl's shoulder and told him to stop. Krahenbuhl turned around and once again told St. Amour to "fuck off."

Another VA police officer, Lieutenant Andrew Turk, approached and attempted to speak with Krahenbuhl. Krahenbuhl told Turk to "fuck off" and that he was "just a security guard." On the sidewalk next to the patient parking lot, Turk grabbed Krahenbuhl's arm. Krahenbuhl responded by assuming a "bladed fighting stance," that is, swinging back his right arm and clenching his fist like he was going to strike Turk.

Only after St. Amour drew his pepper spray did Krahenbuhl relax his stance. St. Amour lowered the pepper spray and the officers attempted to engage him again, informing him they were veterans as well. Krahenbuhl explained that "the VA was fucking with" his disability rating. He then got into his car and sped away.

## B. Procedural Background

Krahenbuhl was charged by information with two counts of disorderly conduct in violation of 38 C.F.R. § 1.218(a)(5), (b)(11). Count 1 alleged that Krahenbuhl "knowingly engaged in conduct which created a loud or unusual noise, and used loud, abusive, or otherwise improper language" during his interactions with VA police officers. Count 2 alleged that he "knowingly engaged in conduct which impeded and disrupted the performance of official duties by Government Employees," respiratory therapists, Mueller and Malchak, "and

used loud, abusive, and otherwise improper language" during his interactions with them.

After a one-day bench trial, Magistrate Judge Sickel found Krahenbuhl guilty on both counts. Krahenbuhl challenged his conviction through a motion for judgment of acquittal and then an appeal to the district court. Neither was successful, and he was sentenced to pay a fine of $500.

## II.   Discussion

On appeal, Krahenbuhl challenges his convictions on two bases: first, that they violate the First Amendment, and second, that there was insufficient evidence to convict him because the government did not prove necessary elements of the crimes.[2] We address each argument in turn.

### A.  First Amendment

In assessing Krahenbuhl's First Amendment challenge, we review legal conclusions de novo and defer to the trial court's factual findings unless they are clearly erroneous. *In re Veluchamy*, 879 F.3d 808, 817 (7th Cir. 2018). To determine whether the convictions violated the First Amendment, we first identify the forum where the speech occurred. Then, we evaluate the constitutionality of the regulation underpinning the convictions.

---

[2] Krahenbuhl abandoned his other arguments—a facial challenge to the regulation under the First Amendment and a Fifth Amendment vagueness challenge—by, among other things, failing to argue them on appeal. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments [on appeal] that are underdeveloped, cursory, and lack supporting authority are waived.").

### 1. *Forum Analysis*

We will assume for purposes of this opinion that Krahenbuhl's expression deserves constitutional protection. But "[e]ven protected speech" can be regulated because speech "is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799 (1985). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* at 800.

The constitutionality of the regulation depends on where the expression occurred, that is, the forum. In turn, "the forum category defines the level of scrutiny applicable to the challenged government action." *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 530 (7th Cir. 2009). At one end of the spectrum are public fora—spaces devoted to public expression and the exchange of ideas. *Cornelius*, 473 U.S. at 800, 802. In public spaces, "speakers cannot be excluded without a compelling governmental interest." *Id.* at 800. A prototypical example is a public sidewalk, which "traditionally ha[s] been held open to the public for expressive activities." *United States v. Kokinda*, 497 U.S. 720, 727–28 (1990) (citation and internal quotation marks omitted).

On the opposite end of the spectrum are nonpublic spaces—areas where greater regulation is permissible because they "[are] not by tradition or designation … forum[s] for public communication." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006) (citation omitted); *see Kokinda*, 497 U.S. at 728–30 (holding that a sidewalk next to a post office was a nonpublic forum because it "was constructed solely to

assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city"). "Exclusion from nonpublic fora is permitted subject to two conditions: the government cannot engage in viewpoint discrimination against speech otherwise within the forum's limitations, and the restriction must be reasonable in light of the purpose served by the forum." *Milwaukee Deputy Sheriffs' Ass'n*, 588 F.3d at 530.

There are also "forum[s] made public by designation," a category that encompasses "public property which the state has opened for use by the public as a place for expressive activity." *Carreon v. Ill. Dep't of Hum. Servs.*, 395 F.3d 786, 796 (7th Cir. 2005) (citation and internal quotation marks omitted). To establish a designated public forum, it is not sufficient for the government to simply "permit[] limited discourse." *Id.* Rather, it must "intentionally open[] a non-traditional forum for public discourse." *Id.* Additionally, "[a]lthough a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* (citation omitted).

We have not had occasion to evaluate whether a VA clinic is a public or nonpublic forum. The Ninth Circuit has, though, and concluded it is nonpublic. *United States v. Szabo*, 760 F.3d 997, 1002 (9th Cir. 2014); *see also Preminger v. Sec'y of Veterans Affs.*, 517 F.3d 1299, 1314 (Fed. Cir. 2008) ("We conclude that VA Medical Centers … are, for First Amendment purposes, nonpublic fora.").

In *Preminger v. Principi*, the Ninth Circuit considered the forum classification of a VA building that functioned as a home for veterans who needed medical treatment. 422 F.3d

815, 824 (9th Cir. 2005). Animating its conclusion that the building was a nonpublic forum was that the building was designed "to provide for veterans who require long-term nursing care," "not to facilitate public discourse." *Id.* Any speech that occurred at the facility, such as between "veterans and their visitors," was ancillary. *Id.*

The record in this case establishes that the Green Bay Clinic is a nonpublic forum as well. Like the building in *Preminger*, the Clinic's "primary aim" is to provide veterans with medical care, not a space to exchange ideas. *Id*. Even if some speech occurred incidentally at Clinic events, the purpose of the Clinic was not to facilitate speech. *See Carreon*, 395 F.3d at 796 (explaining that the government does not create a designated public forum through merely "permitting limited discourse").

The focus of the forum analysis is on "the government's intent," not how the forum is used by speakers, *Cornelius*, 473 U.S. at 802, because "[d]esignated public fora are … created [only] … where the government has expressly dedicated the property for expressive conduct," *Principi*, 422 F.3d at 824. Regardless of how Krahenbuhl might wish to use the Clinic, it was designed to provide outpatient medical treatment, not a forum to air discontent with veterans' benefits. As a result, the Clinic does not belong in the same category as places that "time out of mind, have been used for purposes of assembly, communicating thoughts …, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

### 2. *Regulation*

Having determined that the Clinic is a nonpublic forum, we must evaluate whether 38 C.F.R. § 1.218(a)(5) is viewpoint neutral and "reasonable in light of the purpose served by the forum." *Milwaukee Deputy Sheriffs' Ass'n*, 588 F.3d at 530; *Kokinda*, 497 U.S. at 730 (holding that when analyzing restrictions on speech in a nonpublic forum, the restriction "must be reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view" (citation and internal quotation marks omitted)).

The regulation prohibits, among other things, "[c]onduct on property which creates loud or unusual noise [or] … otherwise impedes or disrupts the performance of official duties by Government employees," as well as "the use of loud, abusive, or otherwise improper language." 38 C.F.R. § 1.218(a)(5). No court in this Circuit has evaluated whether the regulation passes First Amendment muster. Two other circuits have, though, both concluding that it does.

In *Szabo*, the Ninth Circuit found it "undisputed that 38 C.F.R. § 1.218(a)(5) is a viewpoint neutral regulation" and concluded that its application was "reasonable in light of the purpose served by the [VA hospital]." 760 F.3d at 1003 (alteration in original) (citation omitted). The regulation plainly furthered the legitimate government interest of "prohibit[ing] disturbances" so as to "not trigger[] adverse psychological reactions from … patients." *Id.*

Similarly, the Sixth Circuit held that "[t]he restrictions set forth in § 1.218(a)(5) and (b)(11) are reasonable in light of the purposes served by the VA medical facility, which is to provide medical care and services to its veteran patients." *United*

*States v. Puch*, No. 20-3265, 2021 WL 867038, at \*4 (6th Cir. Jan. 21, 2021). It concluded that the restrictions are also "viewpoint neutral because [they] do not discriminate on the basis of content or viewpoint," but instead "restrict conduct, including speech, that tends to impede or prevent the normal operation of the facility in order to serve its purpose of treating patients." *Id.*

We agree with the Sixth and Ninth Circuits that the regulation is viewpoint neutral. Although its prohibition of "otherwise improper language" is broad, it does not distinguish based on the content of the speech but instead how the content is relayed. Put a different way, the regulation does not prohibit speech expressing discontent with the VA but rather language that could adversely affect patients and impede Clinic operations. For the same reasons, the regulation's prohibition against loud and abusive language, loud or unusual noise, and conduct that "otherwise impedes or disrupts the performance of official duties by Government employees" is also viewpoint neutral.

In addition to being viewpoint neutral, the regulation is reasonable for the reasons explained by the Sixth and Ninth Circuits. The Clinic is a place veterans go to receive necessary medical treatment. Loud noises, shouting, abusive language, and other conduct that disrupts Clinic employees from their work is properly prohibited. As the Ninth Circuit concluded, "prohibiting a visitor from yelling obscenities … is eminently reasonable in view of th[ese] goal[s]." *Szabo*, 760 F.3d at 1003. Accordingly, Krahenbuhl's First Amendment challenge to his convictions fails.

### B. Sufficiency of the Evidence

Krahenbuhl also challenges the sufficiency of the evidence supporting his convictions. We will reverse a conviction for insufficient evidence "only when the record contains no evidence, regardless of how it is weighed, from which the [factfinder] could find guilt beyond a reasonable doubt." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (alteration in original) (citation and internal quotation marks omitted). As a result, "[a] defendant posing this challenge faces a nearly insurmountable hurdle." *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010) (citation and internal quotation omitted).

The enabling statute, 38 U.S.C. § 901, obligates the VA Secretary to prescribe regulations for "land and buildings that are under the jurisdiction of the Department and are not under control of the Administrator of General Services." Correspondingly, 38 C.F.R. § 1.218(a) "appl[ies] at all property under the charge and control of the VA (and not under the charge and control of the General Services Administration)."

Krahenbuhl argues that the government failed to prove that the Clinic was "under the charge and control of the VA (and not under the charge and control of the General Services Administration)," which he submits constitute two distinct elements of his alleged crimes. 38 C.F.R. § 1.218(a).

We will address the "charge and control of the VA" piece first. Although there is scant case law on the subject, most cases, like *United States v. DeGarza*, conclude the element is established through "evidence that [the defendant] was inside a VA facility at all relevant times." 468 F. Supp. 3d 794, 798 (W.D. Tex. 2020). Nothing suggests that the VA's control of the facility must be proven with a specific type of evidence.

Viewing the evidence in the light most favorable to the government, a "rational trier of fact could have found" that the Clinic was under the charge and control of the VA. *Faulkner*, 885 F.3d at 492. Officers St. Amour and Turk testified that they were employed by the VA and stationed at the Clinic. They wore VA police uniforms and were responsible for responding to disturbances and silent panic alarms, like the one triggered in response to Krahenbuhl's tense interaction with Mueller. The two respiratory therapists also testified that they worked for the VA at the Clinic, as did a medical support assistant who testified to interacting with Krahenbuhl when he checked in for his appointment.[3]

The closer question is whether the government needed to separately prove that the Clinic was not under the charge and control of the GSA. No courts have addressed whether this is an element of the offense or instead an exception operating like an affirmative defense on which Krahenbuhl has the burden of production.

At the outset, we must consider whether Krahenbuhl invited any error. Pre-trial, the parties submitted dueling trial instructions, proposing the elements of proof for the offenses. Krahenbuhl listed four elements. On the ownership element, he maintained that to be convicted, the magistrate judge would have to find that his "conduct occurred on property under the charge and control of the VA." While the parties disagreed about other elements, such as whether Krahenbuhl

---

[3] Krahenbuhl's primary case in support of his argument, *United States v. Gillis*, is too factually distinct to be persuasive. 12-cr-40028, 2013 WL 1682378, at *4–6 (D. Mass. Apr. 16, 2013). There, the government admitted the VA did not own the property on which the incident occurred. *Id.* There is no such allegation or admission in Krahenbuhl's case.

needed to have acted intentionally or knowingly, neither party listed disproving GSA control as an element of the offense.

After enumerating the elements necessary for a conviction, Krahenbuhl described each element in greater detail. However, for the ownership element, he merely stated:

> [T]he charged offenses are contained within the CFR provision entitled Security and [L]aw [E]nforcement at VA facilities. Section 1.218(a) provides that the rules and regulations apply to all property under the charge and control of the VA that is not under the charge and control of the Government Services Agency.

The first time he indicated that the government had to disprove control by the GSA was in an oral directed verdict motion made after the government's case-in-chief. He argued that the government's "fail[ure] to prove one essential element" of the offense necessitated an acquittal. Contrary to his proposed trial instructions, he argued that proving VA control was not sufficient. Instead, to convict him, the government had to prove the Clinic was *solely* under the control of the VA by disproving the potential for joint control with the GSA.

Krahenbuhl used similar language when he renewed his argument in a written motion for acquittal. He argued that "the Government [had] to prove two parts … (1) [that] the property [was] under the control of the VA; and (2) [that] the property [was] not under the control of the General Services Administration." He referred to the GSA control piece as "[t]he second element."

This Circuit has applied the invited error doctrine when a criminal defendant's proposed jury instructions invited the error of which he later complains. *United States v. Muskovsky*, 863 F.2d 1319, 1329 (7th Cir. 1988); *United States v. Gan*, 54 F.4th 467, 478 n.1 (7th Cir. 2022) (indicating that invited error prohibits appellate review of jury instructions). Where the trial judge solicits proposed jury instructions, a defendant cannot later complain of an instruction he proposed; "it would be a case of 'invited error.'" *United States v. Hamilton*, 499 F.3d 734, 736 (7th Cir. 2007); *see also United States v. Couch*, 94 F. App'x 373, 376 (7th Cir. 2004) ("A defendant cannot complain that the trial court gave an instruction which his counsel requested.").

Analogously, in his proposed trial instructions, Krahenbuhl asserted that, to be convicted, the magistrate judge would have to find ownership and control of the Clinic by the VA. Nowhere in those instructions did he suggest that disproving GSA control was a separate element of the crime—one not implicitly proven by establishing VA ownership and control. The only time he mentioned the GSA was to paraphrase the regulation, not make any discernible argument with respect to GSA control. It was only after the government rested at trial that Krahenbuhl changed course.

A defendant cannot propose the necessary elements of the crime and then, after the government concludes its presentation of evidence, perform an about-face. *United States v. Gaya*, 647 F.3d 634, 640 (7th Cir. 2011) (explaining "[a] party may not 'invite' error [at trial] and then argue on appeal that the error for which he was responsible entitles him to relief" (citation omitted)). The situation might be different if Krahenbuhl had raised his argument earlier, even the morning of trial, or

admitted to erroneously excluding the GSA-control element from his proposed trial instructions. He did neither. Despite almost certainly foreseeing his directed verdict argument (his trial lasted one day), Krahenbuhl permitted the government to present evidence aimed at satisfying the elements of the offense. Only after the government rested did he attempt to pull an ace from his sleeve, claiming that a not-previously-disclosed element prohibited his conviction.

That amounts to an invited error. Consequently, there is no need for us to consider whether disproving GSA control is an element of the offense. *Id.* (calling invited error an "*a fortiori* case of waiver"). We leave that question for another day, should it come.

### III.    Conclusion

For the reasons explained, the judgment of the district court is AFFIRMED.