# United States Court of Appeals
## For the First Circuit

No. 14-2030

ALVIN MARRERO-MÉNDEZ; CYNTHIA PÉREZ-VALENTÍN; CONJUGAL
PARTNERSHIP MARRERO-PÉREZ,

Plaintiffs, Appellees,

v.

GUILLERMO CALIXTO-RODRÍGUEZ, former Carolina Area Commander for
the Puerto Rico Police Department; MARIO RIVERA, Chief of the
Carolina Precinct of the Puerto Rico Police Department; RICARDO
CRUZ-DOMÍNGUEZ, Supervisor of the Puerto Rico Police Department,

Defendants, Appellants,

HÉCTOR PASQUERA, Superintendent of the Puerto Rico Police
Department; WILLIAM OROZCO, Carolina Area Commander of the
Puerto Rico Police Department,

Defendants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

———————————

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

———————————

Margarita Mercado-Echegaray, Solicitor General of the
Commonwealth of Puerto Rico, with whom Andrés González-Berdecía,
Assistant Solicitor General, was on brief, for appellants.
Heather L. Weaver, with whom Daniel Mach, the American Civil
Liberties Union Foundation, Josué Gonzalez-Ortiz, William Ramirez,
and the ACLU of Puerto Rico were on brief, for appellees.

July 19, 2016

**LIPEZ**, **Circuit Judge**.  Plaintiff Alvin Marrero-Méndez ("Marrero"), an officer in the Puerto Rico Police Department ("PRPD"), filed a § 1983 action, claiming that his superior officers ("appellants") violated the Establishment Clause by holding a group prayer while on duty and punishing Marrero for his non-conformance.  Appellants moved to dismiss the complaint, claiming a failure to allege plausibly a constitutional violation and invoking qualified immunity.  The district court denied their motion.  In this interlocutory appeal challenging only the denial of qualified immunity, we affirm the district court's decision.

## I.

The denial of qualified immunity on a motion to dismiss is immediately appealable.  See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); Penn v. Escorsio, 764 F.3d 102, 105 (1st Cir. 2014).  Hence, we review the district court's rejection of qualified immunity, accepting, as we must, all well-pleaded facts in the light most favorable to Marrero.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011); Maldonado v. Fonatanes, 568 F.3d 263, 266 (1st Cir. 2009).

Marrero has been a police officer in the PRPD since 1999.  Prior to the alleged incident, Marrero's responsibilities consisted of law enforcement tasks, such as patrolling, conducting arrests, and undertaking other crime-prevention activities.

- 3 -

On March 9, 2012, Officer Guillermo Calixto-Rodríguez ("Calixto"), a regional commander of the PRPD, summoned forty PRPD officers for a meeting in the parking lot of a shopping mall to discuss a plan for an intervention to take place nearby. Marrero was among those in attendance, as were two of his superiors, Officers Mario Rivera ("Rivera") and Ricardo Cruz-Domínguez ("Cruz"). All of the officers stood in military formation. Toward the end of the meeting, Calixto asked for a volunteer to lead the group in a prayer. These meetings, which occurred every other month or so, typically included a Christian invocation or closing prayer.

On this occasion, Marrero -- who is an "open atheist" -- called Calixto aside and told him that "he object[ed] to such official prayers because they promote[d] religious beliefs to which he [did] not subscribe." He added that "he felt very uncomfortable taking part in the prayer and that he did not want to participate." Marrero also informed Calixto that the prayer violated PRPD regulations, which provided that "[a] strict separation shall be maintained between the church and state."

Calixto became "upset" and ordered Marrero to "abandon the formation." As Marrero was walking away from the group, Calixto shouted that Marrero should stop and stand still until the prayer was finished. Calixto also shouted, in front of the entire formation, that Marrero was standing apart from the group because

- 4 -

"he doesn't believe in what we believe in." Marrero felt humiliated. Obeying Calixto's order, Marrero stood, with his back to the formation, until the prayer ended.

After the meeting, Marrero worked with Cruz, his immediate supervisor, for the rest of the night. Marrero told Cruz that he was upset about the incident with Calixto, and that, as a result, he preferred to be assigned to his usual duties at the airport, away from the area in which the intervention meeting took place. Marrero also began to cry because of the humiliation he had experienced. While on their way to the airport, Marrero told Cruz that he intended to file an administrative complaint about the incident. When they arrived at the airport, Cruz instructed Marrero to hand over his weapon because he was in an emotional state, and to report to Rivera the following Monday to receive further orders about a transfer.

The following Monday, March 12, 2012, Marrero filed an administrative complaint at the PRPD.[1] Two days later, he also met with Rivera, as instructed by Cruz. Rivera presented Marrero with two transfer options: report to the Command Office for clerical tasks or stay in the airport station to perform vehicle-maintenance tasks. Both options were effectively demotions from Marrero's usual responsibilities. Marrero chose the latter and

---

[1] It is not clear from the record how the administrative complaint was resolved.

has since carried out vehicle-related and other such tasks, not the law enforcement activities for which he was trained.

On March 8, 2013, Marrero filed this action, claiming that appellants violated the Establishment Clause by "expos[ing] [him] to unwanted religious exercise and messages by [PRPD] officials."[2] He also alleged that appellants' conduct "endorse[d]" religion and "entangle[d]" the PRPD with religion. Additionally, Marrero claimed that appellants retaliated against him for refusing to participate in, and speaking out in opposition to, the prayer and for filing an administrative complaint regarding the prayer practices.[3] Appellants moved to dismiss the complaint, claiming a failure to allege plausibly a constitutional violation, see Fed. R. Civ. P. 12(b)(6), and invoking qualified immunity.

The district court denied their motion on both grounds. As to the Rule 12(b)(6) defense, the court found that Marrero had adequately alleged an Establishment Clause violation because the

_____

[2] In addition to Calixto, Cruz, and Rivera, Marrero named Héctor Pesquera, PRPD Superintendent, and William Orozco, a regional commander of the PRPD, as defendants in the suit based on supervisory liability. The district court dismissed the claim against Pesquera and Orozco, however, finding that Marrero failed to allege sufficient facts to establish supervisory liability. Marrero has not appealed that ruling, and Pasquera and Orozco are not appellants in this case.

[3] Although the allegations state that Marrero was subject to a hostile work environment based on his religious beliefs, the complaint does not assert an employment discrimination claim under Title VII, see 42 U.S.C. § 2000e et seq., instead framing these allegations as an Establishment Clause violation.

prayer in question took place during an official police meeting, and the allegations plausibly showed that Calixto "forced [Marrero] to observe the prayer[] against his will and his own religious beliefs." Based on these allegations, the court also found that Marrero was punished for his refusal to participate in the prayer by being deprived of his regular duties as a PRPD officer. Such treatment, concluded the court, reinforced the coercive nature of appellants' conduct.

The district court then rejected appellants' claim of qualified immunity. Following the well-established two-step inquiry for qualified immunity, the court noted that its conclusion on appellants' Rule 12(b)(6) defense -- that Marrero plausibly alleged an Establishment Clause violation -- satisfies the first prong of the inquiry on whether there are sufficient facts to establish a constitutional violation. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). The court then analyzed whether the right asserted by Marrero was "clearly established" at the time of the alleged incident. Id. Surveying the state of the law based on Supreme Court, circuit, and district court precedents as of March 2012, the district court concluded that appellants violated a clearly established right because a reasonable officer at that time would have understood that "ordering a subordinate to observe a religious prayer given during an official meeting -- without giving the subordinate the ability to opt out -- would violate the

Constitution."  Appellants filed this interlocutory appeal to challenge the denial of qualified immunity.

## II.

Appellants claim that the district court erred in rejecting their qualified immunity defense because there was no clearly established law placing them on notice that their conduct was unconstitutional.  Specifically, they argue that the law at the time of the alleged conduct did not clearly establish that "[appellants'] actions constituted . . . [s]tate-sponsored official prayers and not merely tolerable religious expression." Appellants claim, moreover, that, even if a reasonable officer should have known that the prayer was state-sponsored, they are still entitled to qualified immunity because the contours of Marrero's right to be free from religious coercion were not clearly defined at the time of appellants' conduct.  In particular, they assert that a reasonable officer would not have known that Calixto's order to Marrero to "abandon the formation" -- which they characterize as an opt-out opportunity -- was insufficient to pass constitutional muster in light of the divergent tests developed in the Supreme Court's Establishment Clause cases.

We review a district court's denial of qualified immunity de novo.  See Rivera-Ramos v. Roman, 156 F.3d 276, 279 (1st Cir. 1998).  Hence, "taking the law as it stood at the time of the conduct in question," we address as a question of law

- 8 -

whether "a set of assumed facts constitutes a violation of 'clearly established law.'" Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)).

## A. Qualified Immunity Standards

Qualified immunity protects government officials from trial and monetary liability unless the pleaded facts establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow, 457 U.S. at 818); see Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011). If either of the two prongs is not met -- i.e., if the facts do not show a constitutional violation or the right in question was not clearly established -- the officer is immune. Either prong may be addressed first, depending on "the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

Here, appellants argue that it is unnecessary to address the first prong inquiry because their primary argument is that the second prong has not been satisfied. We can decide based solely on the second prong, however, only if we concluded that appellants are entitled to qualified immunity on that basis. That is not the conclusion we reach.

## B.  Constitutional Violation

The First Amendment of the United States Constitution proscribes Congress from making laws "respecting an establishment of religion."  U.S. Const. amend. I; see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940) (holding that the religion clauses of the First Amendment apply equally to the states).  As conceived, the organizing principle of the Establishment Clause is "governmental neutrality" -- between "religion and nonreligion," as well as among religions.  McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 860 (2005) (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)); see Wallace v. Jaffree, 472 U.S. 38, 52 (1985) (noting that the Establishment Clause guarantees religious liberty and equality to "the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism").  Hence, the Supreme Court has held that, wherever the boundaries of the Establishment Clause protection may lie, "[i]t is beyond dispute that, at a minimum, . . . government may not coerce anyone to support or participate in religion or its exercise."  Lee v. Weisman, 505 U.S. 577, 587 (1992).

Appellants' conduct violated precisely such a principle. As a threshold matter, the prayer in question was unmistakably a state action.  Appellants are PRPD officers who either initiated or participated in the prayer during an official intervention meeting.  Moreover, regardless of how one may interpret the

- 10 -

constitutionality of the prayer in and of itself,[4] the subsequent events make clear that appellants' actions (collectively) constituted direct and tangible coercion. Immediately after directing Marrero to "abandon the formation," Calixto ordered Marrero, as he was walking away from the group, to stop and stand still for the duration of the prayer. Calixto then shouted, in front of the entire formation, that Marrero was standing apart from the group because "he doesn't believe in what we believe in." After complaining about the incident and filing an administrative complaint, Marrero was transferred to a post where he was deprived of his usual law enforcement responsibilities.

If these actions do not establish religious coercion, we would be hard-pressed to find what would. Among the "essential precepts" of the Establishment Clause are that "[n]either a state nor the Federal Government can . . . force [a person] to profess a belief or disbelief in any religion," and that "[n]o person can be punished for entertaining or professing religious beliefs or disbeliefs." Cty. of Allegheny v. Am. Civil Liberties Union

---

[4] We do not address here the constitutionality of a prayer at an official police meeting in the abstract, apart from the specific events that occurred with respect to Marrero and the group prayer at the intervention meeting. For instance, as we note infra, we do not view Calixto's order to Marrero to "abandon the formation" as an opt-out opportunity and hence do not examine whether the prayer would still be unconstitutional, even with an opt-out procedure, due to the coercive pressures at play in the hierarchical dynamics of police work.

Greater Pittsburgh Chapter, 492 U.S. 573, 591 (1989) (quoting Everson v. Bd. of Educ. of Ewing, 330 U.S. 1, 15-16 (1947)); see Lee, 505 U.S. at 596 ("It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice.").  "[R]esolv[ing] any ambiguities in [Marrero's] favor," Ocasio-Hernández, 640 F.3d at 17, we, like the district court, deem Calixto's order to Marrero to stand still in close proximity to the group until the prayer is concluded as forcing him to observe a religious practice against his will. Similarly, Calixto's comment differentiating and humiliating Marrero based on his religious beliefs, as well as Marrero's demotions following the incident, allege a clear case of punishment on religious grounds.  Indeed, while appellants attempt to deflect the relevance of Marrero's reassignment by suggesting that he requested to work at the airport, his allegations make clear that it was the type of responsibilities he was given at the airport, and the fact that his weapon was taken away, that constituted demotions, not the mere fact of his transfer.

Hence, we conclude that the first prong of the qualified immunity inquiry is met:  appellants violated the Establishment Clause by (i) forcing Marrero to observe a religious practice against his will and (ii) punishing him for his non-conformance.

## C. Clearly Established Law

Appellants would still be entitled to qualified immunity if the right they violated was not "clearly established" at the time of their conduct. A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Hence, while the precise violative action at issue need not have previously been held unlawful, id., the existing precedent from in and out of circuit "must have placed the statutory or constitutional question beyond debate," al-Kidd, 563 U.S. at 741; see Barton v. Clancy, 632 F.3d 9, 22 (1st Cir 2011).

How specifically the right, or correspondingly, the violative conduct, must be identified has been the subject of much dispute. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." al-Kidd, 563 U.S. at 742. The dispositive question is "whether the violative nature of particular conduct is clearly established." Id. (emphasis added); Anderson, 483 U.S. at 640 (noting that the violative action must be understood in a "particularized, and hence . . . relevant, sense"). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 136 S. Ct.

305, 308 (2015) (per curiam) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

Here, appellants argue that there was no clearly established law as of March 2012 that placed them on notice that the prayer was "state-sponsored" and that their conduct was coercive. We can easily dispose of the "state-sponsored" prayer argument. Calixto initiated -- and Rivera and Cruz participated in -- the prayer with a group of police officers during an official intervention meeting. Appellants have not cited, nor have we identified, any case that would deem such a prayer as a voluntary and spontaneous exercise by private individuals. Even in cases where the persons initiating or engaging in prayer are not state officials, the Supreme Court has inferred state sponsorship of the prayer where indirect state involvement suggests an imprimatur on the religious practice. See Sante Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309-312 (2000) (determining that student-led prayers before varsity football games are state-sponsored prayers based on, inter alia, "the importance to many students of attending and participating in extracurricular activities as part of a complete educational experience"); Lee, 505 U.S. at 580, 587-89 (understanding the invocations and benediction prayers at a school graduation ceremony as state-sponsored prayers, even though the prayers were offered by clergy members, rather than school officials). Where, as here, a religious practice is conducted by

a state official at a state function, state sponsorship is so conspicuously present that only "the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986), would deny it.  See, e.g., Marsh v. Chambers, 463 U.S. 783, 784-86 (1983) (describing a legislative prayer offered by a state-employed chaplain without reference to whether the prayer is sponsored by state).

Appellants' second argument regarding coercion warrants a closer look.  The district court found that a reasonable officer in March 2012 would have known that "ordering a subordinate to observe a religious prayer . . . without giving the subordinate the ability to opt out . . . would violate the Constitution."  This formulation of the inquiry, however, is not sufficiently specific. An affirmative answer to this inquiry, though accurate, would state an abstract principle of law, disassociated from the facts of the case.  See al-Kidd, 563 U.S. at 742.  Hence, in accordance with the Supreme Court's guidance, we frame the "clearly established" inquiry as follows:  appellants are entitled to qualified immunity if a reasonable officer in March 2012 would not have known that appellants' conduct was coercive in the situation they encountered.  See Brosseau, 543 U.S. at 199.  The relevant situation, and appellants' actions, consisted of the following: (1) after directing Marrero to abandon the formation, Calixto ordered Marrero, as he was walking away, to stop and stand still

until the prayer was finished; (2) as Marrero stood in the vicinity of the group, Calixto shouted that Marrero was standing separately from the group because he does not subscribe to the same faith as the rest of the group; (3) after Marrero complained about the incident, he was stripped of his law enforcement responsibilities and demoted to lesser tasks.[5]

With that clarification, we examine whether the law as of March 2012 put reasonable officers on notice that appellants' conduct -- ordering a subordinate, against his will, to stand

_____

[5] Appellants attempt to incorporate their version of the facts into the "clearly established" prong analysis. Indeed, they argue that a reasonable officer would not have known that their conduct was coercive because the officer could have understood Calixto's order to "abandon the formation" as an opt-out opportunity for Marrero. Similarly, appellants claim that a reasonable officer could have understood Calixto's comment differentiating Marrero from the group as "nothing more than a true explanation for Plaintiff's legitimate right not to participate in their gathering."

In the procedural posture of this case, however, we construe the factual allegations in the light most favorable to Marrero. See Ocasio-Hernández, 640 F.3d at 17. And, viewing the facts in this light, we conclude, as we did in the first prong analysis, that Calixto's orders "to abandon the formation" and then "stop and stand still" -- given in rapid succession -- forced Marrero to observe a prayer. Likewise, we do not read Calixto's comment as a legitimate explanation for why Marrero was standing apart from the group. The comment was given, unprompted and during an official meeting, by a regional commander of the PRPD who had become "upset" upon hearing Marrero's objection to a group of subordinate officers standing in military formation. Cf. Mellen v. Bunting, 327 F.3d 355, 371 (4th Cir. 2003) (observing that cadets at the Virginia Military Institute were "uniquely susceptible to coercion" due to the cultural emphasis on "obedience and conformity").

nearby while his colleagues engage in a prayer and then humiliating and punishing him for non-conformance -- constitutes religious coercion. We conclude that it did. Indeed, the coerciveness of appellants' conduct is so patently evident that no particular case -- and certainly not one "directly on point," al-Kidd, 563 U.S. at 741 -- need have existed to put a reasonable officer on notice of its unconstitutionality. Nonetheless, existing precedent supports this inescapable conclusion.

In Anderson v. Laird, 466 F.2d 283, 284, 291 (D.C. Cir. 1972) (per curiam), the D.C. Circuit addressed a federal regulation that required cadets and midshipmen at military academies to attend religious services on Sundays unless they objected based on conscientious beliefs. The court struck down the regulation as unduly coercive, despite the opt-out opportunity, because the "government may not require an individual to engage in religious practices or be present in religious exercise." Id. at 291 (Bazelon, J., concurring). Similarly, in Mellen, 327 F.3d at 371-72, the Fourth Circuit held that a mandatory supper prayer at a military academy violated the Establishment Clause, even though the cadets could abstain from the prayer by avoiding the mess hall where the supper prayer takes place. Hence, as of March 2012, these cases stood for the proposition that requiring mature individuals to participate in a group prayer in a setting with a

strict hierarchy amounts to religious coercion, even when an opt-out opportunity is provided to objecting persons.[6]

Courts have also found coercion where the government required conformance to a religious belief as a condition for a benefit, such as parole eligibility for prisoners or job security for government employees. Indeed, before March 2012, numerous courts had held that requiring prisoners to attend a program that has a religious component as a condition for parole eligibility is unconstitutional. See, e.g., Inouye v. Kemna, 504 F.3d 705, 713 (9th Cir. 2007) (holding that a mandatory drug treatment program for prisoners is "clearly coercive" where the program is rooted in religious faith); Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1074-75 (2d Cir. 1997) (same); Kerr v. Farrey, 95 F.3d 472, 479-80 (7th Cir. 1996) (same).

Courts have likewise applied the same principle to government employment cases. In Venters v. City of Delphi, 123 F.3d 956, 970 (7th Cir. 1997), an employee of the city police department sued the police chief, alleging that he violated the Establishment Clause by "pressur[ing] her to bring her thinking and her conduct into conformity with the principles of his own

_____

[6] We reiterate that, while Anderson, 466 F.2d at 291, and Mellen, 327 F.3d at 371-72, could be read as suggesting that the prayer at issue in this case would be unconstitutional even with an opt-out opportunity, we do not decide that question on this record. As we noted in footnote 4, the facts indicate that such an opt-out opportunity was not provided to Marrero.

religious beliefs, and admonish[ing] her in no uncertain terms that she was at risk of losing her job if she was unwilling to do so." Based on these allegations, the Seventh Circuit held that the police chief "engaged in the kind of coercion proscribed by the establishment clause." Id.; see also Milwaukee Deputy Sheriffs Ass'n v. Clarke, 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007) (holding that the county sheriff and sheriff's captain impermissibly "promoted religion through the 'coercive power of government'" when they invited representatives of a Christian organization to convey messages containing religious content to deputies at mandatory work meetings) (quoting Cty. Of Allegheny, 492 U.S. at 660), aff'd, 588 F.3d 523 (7th Cir. 2009). Additionally, long before Venters, the Supreme Court held that requiring an individual to declare a belief in God before taking a public office is tantamount to "forc[ing] a person 'to profess a belief or disbelief in any religion,'" an emblematic example of an establishment of religion. Torcaso v. Watkins, 367 U.S. 488, 489-90, 495 (1961).

Appellants' attempt to create ambiguity in the law by analogizing this case to inapt Establishment Clause cases is unavailing. Appellants cite, for instance, legislative prayer cases, in which the Court has relied on a tradition of ceremonial prayers that has long co-existed with the Establishment Clause. See, e.g., Town of Greece v. Galloway, 134 S. Ct. 1811, 1828 (2014)

- 19 -

(holding that opening town meetings with prayers does not violate the Establishment Clause because it "comports with our tradition and does not coerce participation by nonadherents"). They also cite cases involving government aid to religious schools, see, e.g., Lemon v. Kurtzman, 403 U.S. 602, 606-11 (1971), or religious displays on public premises, see, e.g., Van Orden v. Perry, 545 U.S. 677, 681 (2005), which employ the three-part Lemon test and the endorsement test, respectively. See Lemon, 403 U.S. at 612-13 (organizing the "cumulative criteria" developed in the Court's Establishment Clause cases into three standards, the third of which prohibits "excessive government entanglement of religion"); Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J. concurring) (articulating the endorsement test as prohibiting sending "a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community").

None of these cases remotely resemble what we have here -- an objecting individual who was forced to observe a prayer and humiliated and punished for his non-conformance. Ambiguity in the law cannot be manufactured by borrowing from factually and legally distinguishable cases. See El Dia, Inc. v. Rossello, 165 F.3d 106, 110 n.3 (1st Cir. 1999) (noting that "the location and level of the precedent, its date, its persuasive force, and its

level of factual similarity to the facts before this Court may all be pertinent to whether a particular precedent 'clearly establishes' law for the purposes of a qualified immunity analysis"). However complex the nuances of the Establishment Clause doctrine may be for cases without the direct coercion present in this case, a reasonable officer in March 2012 would have known that appellants' conduct amounted to direct and tangible coercion, a paradigmatic example of an impermissible establishment of religion.

The district court's denial of qualified immunity is, therefore, affirmed.

<u>So ordered</u>.