THOMPSON, Circuit Judge,
dissenting.
Mark Eves is qualified to lead Good Will-Hinckley. This really goes beyond the political. This is personal and vindictive. I often' disagree with Speaker Eves, but he’s a fine and honest man. More importantly, he’s a husband and a father of three beautiful kids who is trying to support his family. Political battles are one thing, but trying to ruin someone economically is quite another.
Roger Katz, a Maine
Republican state senator[7]
Let what happened here sink in for a moment: As part of his 2015 scorched-earth campaign against Democrats, Republican Governor LePage threatened to put GWH—a century-old social-service organization for at-risk children—out of business by withholding over a cool mil in state funding unless GWH canned Democratic House Speaker Eves as its president. That’s the story underlying Speaker Eves’s complaint. And it’s the one we must take as true given the pleading-stage nature of this - controversy. See, e.g., Mor *147 ales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012).
Anyway, zeroing in on the second prong of the qualified-immunity analysis (the clearly-established-right prong), my colleagues basically believe a'governor back then could’ve reasonably thought it perfectly legal to do what Governor LePage did, because, they say, no prior case “forbade” the precise conduct that Speaker Eves complains of. Take a second and reread the majority’s holding (fyi, I’ve added bracketed letters for ease of reference): arguing that [a] no case holds a government official liable for pressuring a “private” “third party” to retaliate against another, the majority writes that
an official in the Governor’s position reasonably could have been' uncertain whether this particular series of actions, [b] falling within broad discretion given by the legislature and [c] pertaining to funds not yet formally appropriated, amounted to a violation of Speaker Eves’s constitutional rights.
On top of that, my colleagues insist that [d] the Governor' “reasonably could have believed ... that he was acting lawfully by criticizing and commenting upon GWH’s plan to employ a president with a track record of opposition to [his] priorities with respect to education policy.” Convinced that the majority’s qualified-immunity analysis is off the mark, I write these words of protest.
The qualified-immunity defense hardly gives an official carte blanche to trash a citizen’s constitutional rights simply because the fact pattern of the case doesn’t precisely match the fact pattern of earlier cases. See, e.g., Hope v. Pelzer, 536 U.S. 730, 739, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (explaining that “officials can still be on notice that their conduct violates established law even in novel factual circumstances,” and adding that “[f]or a constitutional right to be clearly established, its contours ‘must be sufficiently clear that a reasonable official would understand that what he is doing violates that right’” (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))); Marrero-Méndez v. Calixto-Rodríguez, 830 F.3d 38, 46 (1st Cir, 2016); Mlodzinski v, Lewis, 648 F.3d 24, 38 (1st Cir. 2011). That makes sense, because
[t]he easiest cases don’t even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.
K.H. Through Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J., for the court); accord Marrero-Méndez, 830 F.3d at 47 (holding that because the “coerciveness” of the official’s actions is “patently” obvious, “no particular case— and certainly not one directly on point— heed have existed to put a reasonable officer on notice of its unconstitutionality” (citation and quotations omitted)). What this means is that a plaintiff can meet his burden on the clearly-established front either by showing a prior case factually on all fours with the current one or by showing a violation so “obvious” that a reasonable person would’ve known about it, see Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)—note, please, .that a violation fits the so-obvious category if “the relevant legal rights and obligations”, were “particularized enough” that a sensible public servant could’ve “extrapolate[dj from them and conclude[d] that a certain course of conduct [would] violate the law,” see Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003) (en banc) (opinion of Selya, J.).
*148 Viewed against this backdrop, my co-panelists’ analysis doesn’t persuade. Take first their comment—point [a]—that no case has ever put a public official on the liability hook for pressuring a private third-party entity to ax one of its employees. Undercutting their position is the fact that the very opinion they cite to support their position also says that “a public official” who took “some type of adverse action” impinging the plaintiffs First Amendment rights may be personally liable if he ‘“threatened]’ or ‘coerce[d]’ the third party to act” See Zaloga v. Borough of Moosic, No. 15-2723, 2016 WL 6156003, at *4 (3d Cir. Oct. 24, 2016) (quoting McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001)). And assessing the allegations through the required plaintiff-friendly prism, I have no trouble concluding that Governor LePage’s bullying—forcing GWH to sack Speaker Eves on pain of losing more than a million bucks in expected state funding, knowing as he did that such a loss would likely kill GWH—is the type of coercion condemned by Zaloga.
As for the majority’s talk about Governor LePage’s funding discretion—point [b]: Does anyone think the Governor would or should get off scot-free if he had browbeat a state-funds-receiving entity into dumping an employee for religious, racial, or gender reasons? No way. Anyhow, a case on our books long before the present fracas flatly contradicts Governor Le-Page’s view—embraced by the majority— that the First Amendment doesn’t apply to the mere withholding of discretionary state funding. See El Dia, Inc. v. Rossello, 165 F.3d 106 (1st Cir. 1999). An El Dia-run newspaper published a bunch of unflattering articles about Puerto Rico’s then governor and his administration. Id. at 108. Retaliating, the governor and other officials had 18 government agencies stop advertising in the paper. Id El Dia sued, alleging restriction of its First Amendment rights. Id. A district judge later granted the defendants’ qualified-immunity-based motion to dismiss. Id. On appeal, the defendants persisted in arguing that no ‘“clearly established’ First Amendment law” barred them from pulling gobs of discretionary “government advertising” from the paper as punishment for its knocking the administration. Id. But we would have none of it, saying in a ringing statement that “[i]t would seem obvious that using government funds” as a stick to punish First Amendment activity offends the Constitution because “[cjlearly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests.” Id. at 109-10 (emphasis added) (citing Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).
As I see it, a levelheaded governor could’ve extrapolated from El Dia that he couldn’t withdraw discretionary state funding to get back at a political opponent for exercising First Amendment rights. The majority tries to deflect ElDia’s impact by arguing that “El Dia involved intrusion by a governor into the operations of a newspaper and the freedom of the press—factors not present here.” But nothing in El Dia’s money quote—that “[cjlearly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests”—limits its reach to newspaper/freedom-of-the-press cases. Rather, a fair reading of the words used there gave Governor LePage fair warning that his now-challenged actions would cross the constitutional line.
That leads us to my co-panelists’ point [c]—that Governor LePage’s actions related to “not yet formally appropriated” funds. Well, they never explain why that matters. Regardless, the complaint alleges *149 the Governor understood that discretionary funds for GWH were “very likely to remain in the budget when it was enacted.” After all (to quote the complaint again), the $132,500 he had frozen “had already been submitted by” the department of education to the state controller’s office “for payment” to GWH in the first quarter of the proposed budget—that the controller was getting ready to make this payment shows how everyone believed the money would be in the soon-to-be-enacted budget. And if more were needed, the Governor’s threats certainly presupposed that GWH-related funds would stay in the budget.
And that leaves us with the majority’s point [d]—that Governor LePage can get away with doing what he did because Speaker Eves opposed his education policy. I see a big problem: by accepting the Governor’s response to Speaker Eves’s political-affiliation-based allegations, they’re not taking the complaint’s well-pled allegations as true and reading them in the light most hospitable to the Speaker—which is a no-no. See generally Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 7 (1st Cir. 2014) (discussing the motion-to-dismiss protocol).
The bottom line: Clearly-established law didn’t give Governor LePage the discretion to infract Speaker Eves’s constitutional rights. And because the majority—though conscientious—rules otherwise, I respectfully but emphatically dissent.

. A quote lifted from Speaker Eves’s operative complaint.