In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-3237

NANCY KNUDTSON,

*Plaintiff-Appellant,*

*v.*

COUNTY OF TREMPEALEAU, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-00354-wmc — **William M. Conley**, *Judge.*

_____

ARGUED OCTOBER 2, 2020 — DECIDED DECEMBER 9, 2020

_____

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* When his friend and mentor passed away, Taavi McMahon, the District Attorney for Trempealeau County, Wisconsin, decided to close his office for the day of the funeral and encouraged his staff to attend the service. One of those staff members, Nancy Knudtson, refused to attend because she wanted to complete some work at the office. Mr. McMahon took issue with Ms. Knudtson's decision and both dug in their heels for what became a bitter dispute.

Eventually, the County placed Ms. Knudtson on paid administrative leave in an effort to de-escalate the dispute. Later, the County offered her another position at the same pay grade; Ms. Knudtson declined the alternate position. Because the County had no other available position, it then terminated her employment.

Ms. Knudtson filed this action in the United States District Court for the Western District of Wisconsin, alleging that Mr. McMahon and Trempealeau County had violated the Establishment Clause because the funeral that she had refused to attend took place at a church and involved a religious service.[1] In due course, Mr. McMahon and the County moved for summary judgment, and the district court granted the motion. Because the district court correctly determined that the guarantees of the Establishment Clause were not violated by the actions of the defendants, we now affirm the judgment of the district court.

# I

## BACKGROUND

At the time of her termination in March 2018, Ms. Knudtson had worked for the County for over forty-five years. Since 1990, she had been assigned to work in the District Attorney's Office. At first, she was a secretary and receptionist; then she became a legal secretary, and finally, starting in 2013, she worked as a paralegal/office manager.

For the final six years of Ms. Knudtson's tenure in the District Attorney's office, Mr. McMahon served as the District

---

[1] The jurisdiction of the district court was predicated on 28 U.S.C. §§ 1331 and 1443.

Attorney. In addition to Ms. Knudtson, two other county employees worked in the District Attorney's office; Robin Leonard served as the victim witness coordinator, and Carol Betthauser served as a legal assistant. Although Ms. Knudtson was a county employee, her written job description as a paralegal and office manager stated that she worked under the direction of the District Attorney.

The events that precipitated this case began in September 2017, when Gerald Fox, Mr. McMahon's mentor and the District Attorney for Jackson County, Trempealeau's neighboring county, passed away unexpectedly. Mr. Fox's funeral was scheduled for September 8 at a Methodist church. The day before, Mr. McMahon emailed his staff, informing them that he planned to close his office on the day of Mr. Fox's funeral so that employees could attend the service. Mr. McMahon also wrote, in part: "It is my preference that we all go to pay our respects but I will not require attendance, I will only encourage it."[2]

A few hours after Mr. McMahon sent the email, Ms. Knudtson responded that she and the other two county-employed staff members in the DA's office preferred to work in the office rather than attend Mr. Fox's funeral. She explained that, under the County's HR handbook, staff members were required to use vacation time to attend the funeral. She also noted that she was scheduled to meet with a law enforcement officer at the time of the funeral service to finish work on a recently assigned criminal complaint.

---

[2] R.45 ¶22.

Ms. Knudtson also informed Mr. McMahon that she planned to attend Mr. Fox's wake that evening.

In her deposition, Ms. Knudtson said that when she told Mr. McMahon that she did not want to attend Mr. Fox's funeral, she did not know that the funeral would be a religious service. She had learned from Mr. Fox's obituary that he was Methodist, but her decision not to attend Mr. Fox's funeral had nothing to do with its religious nature.[3]

On the same day, September 7, Ms. Knudtson spoke with Amy Spriggle, the County's Human Resources Director. Ms. Spriggle confirmed that if employees wished to attend the funeral, they would have to take a vacation day; the County's rules require employees to use vacation time to attend a funeral for anyone other than a close relative. Ms. Spriggle then consulted the County Corporation Counsel, Rick Niemeier, who in turn called Mr. McMahon and told him that he must keep the District Attorney's Office open to allow staff to work. Mr. McMahon declined to follow Mr. Niemeier's advice. In his view, it was unfair to require employees to take vacation time in order to attend the funeral.

On the day of the funeral, Mr. McMahon gathered Ms. Knudtson, Ms. Betthauser, and Ms. Leonard in a conference room and informed them that he still planned to close the office for the funeral. Mr. McMahon told Ms. Betthauser that if she was worried about the County's requirement that she take a vacation day to attend the funeral, he would pay her out of his own pocket. Ms. Knudtson and Ms. Betthauser

---

[3] The parties do not dispute that Mr. Fox's funeral was held in a Methodist church, that the service involved several scripture readings and religious songs, and that a pastor led the services.

still wished to work rather than attend; Ms. Leonard agreed to attend. Ms. Knudtson recounts that Mr. McMahon became agitated. (It is disputed, but immaterial, exactly how agitated.) Mr. McMahon then gave Ms. Knudtson and Ms. Betthauser their options: (1) go to the funeral; (2) work from home; or (3) take a vacation day. Ms. Betthauser became upset and began to cry during this exchange with Mr. McMahon.

Ms. Knudtson left the conference room to find Ms. Spriggle, the Human Resources Director. Ms. Knudtson and Ms. Spriggle then walked back to the District Attorney's office, where Ms. Spriggle told Mr. McMahon that he could not force County staff to work from home. Eventually Ms. Betthauser agreed to attend the funeral despite her earlier reluctance. She testified in her deposition that she did not "want to make any waves."[4]

Mr. McMahon then gave Ms. Knudtson three revised options: (1) attend the funeral; (2) work from home; or (3) take leave. Ms. Spriggle, during her deposition, recalled the third option as being a suspension.[5] Ms. Spriggle informed Mr. McMahon that the County did not have a work from home policy, so the second option was essentially off the table. Mr. McMahon took issue with Ms. Spriggle's involvement in his office's affairs; the parties dispute whether Mr. McMahon voiced his displeasure using profanity. Endeavoring to de-escalate the situation, Ms. Knudtson left Mr. McMahon's office to take a walk around the County building.

---

[4] R.49 ¶52.

[5] R.53 ¶55.

After Ms. Knudtson left the office, Mr. McMahon called the building maintenance staff to have the lock on the main office door changed. He next called the State's information technology department in Madison, Wisconsin, to freeze Ms. Knudtson's account and instructed that it was not to reactivate her account until he told it to do so.

A short time after leaving Mr. McMahon's office, Ms. Knudtson went to the County's human resources department to speak with Ms. Spriggle and Mr. Niemeier. Ms. Spriggle assured Ms. Knudtson that she had done nothing wrong and that her job was not in jeopardy. Ms. Knudtson, in her deposition, recalled that Ms. Spriggle and Mr. Niemeier asked her whether she would consider attending the funeral, and she reiterated her desire not to attend.[6] Ms. Spriggle and Mr. Niemeier then decided to send Ms. Knudtson home for the day with full pay; Ms. Spriggle authorized Ms. Knudtson's timesheet, which recorded Ms. Knudtson as working on September 8. The County then placed Ms. Knudtson on paid administrative leave until the situation stabilized.

On either Monday, September 11, or Tuesday, September 12 (during the week after the County placed Ms. Knudtson on paid administrative leave), Ms. Spriggle informed Mr. McMahon of Ms. Knudtson's status. Then, on the day of that conversation or the next, Mr. McMahon met with Ms. Spriggle and Mr. Niemeier. During that meeting, Ms. Spriggle told Mr. McMahon that the options he had presented to Ms. Knudtson on the day of the funeral had not been feasible. Mr. McMahon then informed Ms. Spriggle that if Ms. Knudtson returned to the office, it would not be as the office

---

[6] R.19 at 30–31.

manager and mentioned possibly terminating her. Ms. Spriggle left this conversation with the understanding that it would be highly difficult for Ms. Knudtson to return to work with Mr. McMahon. Later that week, Ms. Knudtson spoke to Ms. Spriggle over the phone and reiterated her desire to return to work as soon as possible.[7]

On September 18, Ms. Spriggle arranged for a meeting later in the week with Mr. McMahon, Ms. Knudtson, and Mr. Niemeier to discuss Ms. Knudtson's return to work. That meeting took place on September 20. County Board Chairman Dick Miller and Chairman of the Executive/Finance Committee Dick Frey also attended. Mr. McMahon did not attend, apparently because he was hospitalized with chest pains.

A week later, Mr. McMahon sent a letter to Ms. Spriggle. In the letter, Mr. McMahon wrote that Ms. Knudtson had abandoned her job and that he had not heard from her since the day of Mr. Fox's funeral. Ms. Spriggle and Mr. Niemeier then clarified with Mr. McMahon that Ms. Knudtson had not abandoned her position; rather the County had placed her on paid administrative leave until the dispute cooled down. Mr. McMahon then conveyed that he was no longer interested in Ms. Knudtson's returning to work in his office.

From September 2017 until her eventual termination, Ms. Knudtson expressed a desire to return to work; she also expressed, however, a desire to no longer work with Mr. McMahon. In November 2017, the County Board

---

[7] Whether the County had the authority to order Ms. Knudtson back to work in the DA's office is an unclear area of Wisconsin state law. Because that legal ambiguity ultimately does not impact our decision in this case, we have no reason to wade into the state law question.

attempted to facilitate another reconciliation between Mr. McMahon and Ms. Knudtson, but Mr. McMahon reiterated his belief that Ms. Knudtson's return to the office would not be feasible.

In January 2018, Ms. Spriggle contacted Ms. Knudtson about a possible new position with the County. During a closed-door session of the Executive/Finance Committee and Personnel/Bargaining Committee, County Board members discussed creating a new position for Ms. Knudtson. The idea was to transfer some of the DA's Office's duties (certain work on cases involving children in need of protective services or termination of parental rights) to the Corporation Counsel's Office. Ms. Knudtson would work on the transferred cases in the new position, which would be at the same pay grade as her office manager position with the District Attorney's Office.[8] But, because the plan involved transferring duties out of the DA's office, a legal review and approval from other entities would be necessary.

At the meeting, Ms. Knudtson requested a description of the new position, but the County told her that it did not yet have a position description.[9] The day after the meeting, Ms. Knudtson told Ms. Spriggle that she would not accept the new position without a job description. In Ms. Knudtson's

---

[8] R.44 ¶¶103–04.

[9] In her deposition, Ms. Spriggle did not recall Ms. Knudtson requesting a position description, but the differences in recollection are immaterial. Ms. Spriggle also testified that she would "like to think" she would have produced a job description if asked. R.16 at 25.

view, she could not accept without knowing what duties the job entailed.

A few weeks later, on February 13, 2018, the County sent Ms. Knudtson a letter terminating her effective March 9, 2018. In part, the County wrote: "Trempealeau County has attempted numerous times to resolve your employment situation in the District Attorney's Office. The County attempted to return you to your position in the District Attorney's Office, however, … this has not been possible." The County then noted Ms. Knudtson's decision to turn down the potential new position: "The County also offered to create a new position … in an attempt to allow you to continue your employment with [the] County … . [Y]ou advised Ms. Spriggle that you were not interested in the proposed new position. Unfortunately, the County does not have an equivalent position available for you."[10]

Ms. Knudtson then filed this action. Her complaint alleged a violation of her rights under the Establishment Clause and under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3).[11] She brought no other federal claims and no state claims.

Ms. Knudtson abandoned her FLSA claim at the summary judgment stage and proceeded with her Establishment Clause claim. The County and Mr. McMahon moved separately for summary judgment; the district court granted the motions. In its opinion, the district court rejected Ms. Knudtson's Establishment Clause claim under both of her proposed theories—

---

[10] R.49 ¶147.

[11] R.3.

the coercion test and primary effect prong of the *Lemon* test. With respect to the coercion argument, the district court took the view that neither the County nor Mr. McMahon had coerced Ms. Knudtson to participate in a religious activity because, in the end, she had the choice of attending the funeral or being placed on paid administrative leave and because she never actually attended Mr. Fox's service. The district court also noted that Ms. Knudtson never objected on religious grounds to attending the funeral. As for the primary effect argument under the *Lemon* test, the district court concluded that Mr. McMahon's and the County's actions did not have the primary effect of establishing or inhibiting religion. Ms. Knudtson, the district court observed, refused to attend the funeral simply because she wanted to work in the office during the service. And Mr. McMahon wanted to close the office to honor his friend, not to advance or inhibit religion. No reasonable observer, therefore, would understand the governmental actions to be about religion. Therefore, the district court held that, on both Establishment Clause theories, Ms. Knudtson's claim failed.

Upon the district court's entry of a final judgment, Ms. Knudtson timely filed this appeal.[12]

## II

## DISCUSSION

We review a district court's grant of summary judgment de novo. *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011). Summary judgment is appropriate when "there is no genuine dispute as to any

---

[12] Our jurisdiction is secure under 28 U.S.C. § 1291.

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must draw "all justifiable inferences" in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Its protections also operate against state and municipal governments. *See Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 14–18 (1947). The Supreme Court has articulated several frameworks for evaluating Establishment Clause claims. Yet, irrespective of which analytical framework applies, "the touchstone for Establishment Clause challenges remains 'the principle that the First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion.'" *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 850 (7th Cir. 2012) (en banc) (quoting *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005)). We have noted frequently that Establishment Clause analysis requires a fact-intensive and context-intensive inquiry. *See, e.g., id.*

Ms. Knudtson asks that we evaluate her claim under two Establishment Clause frameworks: the coercion test and the primary effect prong of the *Lemon* test. We therefore will examine the case under both of these frameworks.

**A.**

We turn first to the coercion test. This test "seeks to determine whether the government has applied coercive pressure on an individual to support or participate in religion." *Id.* It is grounded in a pair of Supreme Court decisions: *Lee v.*

*Weisman*, 505 U.S. 577 (1992), and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). In *Lee*, the Supreme Court invalidated a public school district's practice of including benedictions at its middle and high school graduation ceremonies. The Supreme Court noted that school officials exercised a "high degree of control" over the ceremony. *Lee*, 505 U.S. at 597. The middle school principal in *Lee* decided to include an invocation and benediction in the graduation ceremony. *Id.* at 587. He also chose the rabbi to perform the invocation and benediction. Consequently, the Supreme Court concluded, the school district "in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student." *Id.* at 598.

In *Santa Fe*, the Supreme Court, following its precedent in *Lee*, invalidated a school district's policy that authorized student-led prayer before high school football games. *See* 530 U.S. at 301. There, the Court observed that the "invocations [were] authorized by a government policy and [took] place on government property at government-sponsored school-related events." *Id.* at 302. The Court also rejected the school district's argument that the football games' extracurricular status meant there was no coercion for students to attend. Some students—cheerleaders and members of the band— were required to attend the games. And the Court observed that the choice between taking part in the tradition of high school football and avoiding "personally offensive religious rituals is in no practical sense an easy one." *Id.* at 312. The Court ended its coercion test discussion by stating that "the Constitution is abridged when the State affirmatively sponsors the particular religious practice." *Id.* at 313.

In *Lee* and *Santa Fe*, the religious activity or setting at issue was fairly attributed to the government. The religious element of the case was not mere happenstance. In *Lee*, the principal chose to have an invocation and selected the rabbi to offer a prayer. In *Santa Fe*, the school enacted a policy to facilitate the student-led prayer at football games. Similarly, in *Doe ex rel. Doe v. Elmbrook School District*, 687 F.3d at 843, 855–56, we held that a school district's decision to book a church as its graduation venue despite the danger of proselytization resulted in impermissible coercion. Moreover, in all three cases, the government took an affirmative step to involve religion in an activity it pressured individuals to participate in or a setting it pressured them to attend. *See also Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 590 (2014) (opinion of Kennedy, J.) (noting *Lee*'s emphasis on the school's control over the conduct of the students and substance of the graduation ceremony). The connection between the governmental pressure and the religious activity or setting must be tight enough that the government can be said to have "affirmatively sponsor[ed] the particular religious practice" at issue. *See Santa Fe*, 530 U.S. at 313.

Although *Lee* and *Santa Fe* both involved religious coercion at school, we have applied the coercion test in the employment context as well. In *Venters v. City of Delphi*, 123 F.3d 956, 970 (7th Cir. 1997), we held that a city police chief violated the Establishment Clause when he pressured an employee to "bring her thinking and her conduct into conformity with the principles of his own religious beliefs" and threatened to terminate her if she did not.

Other circuits also have addressed religious coercion in the employment context, and their cases are illustrative of the

principle. In *Warnock v. Archer*, 380 F.3d 1076 (8th Cir. 2004), our colleagues in the Eighth Circuit addressed an art teacher/part-time bus driver's challenge to a superintendent's prayer at mandatory faculty meetings and the display of religious items in the superintendent's office. It held that the superintendent's conduct violated the Establishment Clause under the endorsement test, but not the coercion test. *See id.* at 1080. In rejecting the coercion claim, the court noted that the teacher's relationship to the school was "contractual," unlike the inherently coercive nature of the schoolchildren-to-school relationship seen in *Lee* and *Santa Fe*. In addition, the court noted that the teacher was "clearly a strong-willed adult who is unlikely to be indoctrinated by the religious activity of his employer." *Id.* The Sixth Circuit reached a similar holding in *Chaudhuri v. State of Tennessee*, 130 F.3d 232 (6th Cir. 1997). There, a professor at a state college challenged prayer at certain university events, including commencement. The Sixth Circuit held that there was no impermissible coercion because the school did not require faculty attendance at the events and, in any event, there was little risk that the Ph.D.-credentialed professor would be susceptible to coercion in the same way that schoolchildren were in *Lee*. *See id.* at 238–39.

On the other hand, in *Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38 (1st Cir. 2016), the First Circuit concluded that unlawful coercion had occurred. In that case, commanding officers in the Puerto Rico Police Department ordered an officer to remain present during a group prayer and publicly chastised him for being atheist. *Id.* at 41–42. The court held that the considerable pressure to conform, the isolation the officer experienced, and the demotion resulting from his complaint about the incident constituted impermissible coercion. *Id.* at 44–45.

The context that we encounter here is quite different from the cases in which our court and others have found government conduct to be coercive. The County's agents, Ms. Spriggle and Mr. Niemeier, never pressured Ms. Knudtson to attend the funeral. They asked at one point whether Ms. Knudtson would consider attending the funeral, but, when considered in context, that question was posed in a manner clearly designed to cool off the increasingly heated dispute between Mr. McMahon and Ms. Knudtson. The lack of coercion is evinced in Ms. Spriggle and Mr. Niemeier's support of Ms. Knudtson's decision not to attend. Ms. Knudtson's eventual termination stemmed not from her refusal to attend the funeral, but from her decision to decline the alternate position the County offered, an offer that further shows that the County did not exert impermissible pressure on Ms. Knudtson.

As for Mr. McMahon, even though his initial email suggested attending the funeral was voluntary, his subsequent demeanor toward Ms. Knudtson and Ms. Betthauser perhaps suggested otherwise. Still, Mr. McMahon's pressure on Ms. Knudtson—though short of the temperament we hope to see public officials display—is different in kind from that at the heart of *Lee* and *Santa Fe*. Here, Mr. McMahon's affirmative decision was simply to close his office for the day of Mr. Fox's funeral. Mr. McMahon's pressure on Ms. Knudtson and Ms. Betthauser stemmed not from their refusal to attend the funeral, but from their challenge to his authority to close his office. That Mr. McMahon also voiced frustration with Ms. Spriggle and Mr. Niemeier's similar challenge to his authority only confirms the conclusion that closing the office was at the front of Mr. McMahon's mind. Moreover, it is clear that Mr. McMahon would have made the same decision to

close his office had Mr. Fox's funeral been at a Baptist church, a Catholic church, a Synagogue, a Mosque, or someplace entirely secular. Mr. McMahon's conduct was unrelated to the religious nature of Mr. Fox's funeral. He did not control or choose the venue for Mr. Fox's funeral. He also had no say about the content of the funeral service. In short, that Mr. Fox's funeral took place at a Methodist church had nothing to do with Mr. McMahon's actions. Nor did Ms. Knudtson's objection to attending have anything to do with the religious nature or venue of the ceremony. This case is an ordinary employment dispute about business hours and leave; it does not invoke the concerns central to the Establishment Clause.

Our observation that the challenged religious activity must be fairly attributed to the government does not mean the government must act with a religious motive in order to fail the coercion test. For example, the principal in *Elmbrook* chose the church to host the school's graduation because the school's gymnasium, a prior graduation venue, had a history of uncomfortable seating and temperature. *See* 687 F.3d at 844. Nothing in that case suggested that the principal acted with the motive of exposing the schoolchildren to religion. Still, we said that the principal's decision to hold the graduation ceremony—an event of immense importance to the students—in an indisputably religious setting constituted impermissible religious coercion. Yet, there, unlike here, the government chose affirmatively to involve religion in the mandatory graduation ceremony.

As we have said in the past, "before we can find that something runs afoul of the Establishment Clause, we must do more than spot a single religious component of a challenged

activity, no matter how inconsequential." *Mayle v. United States*, 891 F.3d 680, 684 (7th Cir. 2018) (citing *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984)). Context is key in ascertaining whether the government has endorsed religion or preferred one religion over another. *See Santa Fe*, 530 U.S. at 315. Here, two factors are especially important to our holding that neither Mr. McMahon nor the County impermissibly coerced Ms. Knudtson. First, Ms. Knudtson is an adult. Both *Lee* and *Santa Fe* involved schoolchildren—primarily middle and high school students. As the Supreme Court has emphasized, "adolescents are often susceptible to pressure from their peers towards conformity." *Lee*, 505 U.S. at 593; *see Santa Fe*, 530 U.S. at 311–12. We also have highlighted the "heightened" concerns of coercion when young students are involved, particularly when the students are a "captive audience." *See Freedom from Religion Found., Inc. v. Concord Cmty. Schs.*, 885 F.3d 1038, 1048–49 (7th Cir. 2018) (citing *Lee*, 505 U.S. at 592). In other cases, the Supreme Court has noted that adults are less susceptible to pressure. *See Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (Adults are "presumably not readily susceptible to 'religious indoctrination' or peer pressure." (internal citations omitted)).

Second, this case involves a funeral. A sad, but ordinary, part of being an adult in our society is attending funerals for family, friends, neighbors, and coworkers. In our pluralistic society, an individual inevitably will attend the funeral of someone who chooses to mark the end of life in a manner different from one's own traditions. Those in public life, or public service as representatives of the community, probably encounter this situation more often than most of their fellow citizens. In our contemporary American culture, funeral services are, at least in part, different from other religious services. It

is common for members of many faiths, or no faith, to attend funeral services. Funeral services offer an opportunity for people to come together to remember and honor the deceased. Absent extraordinary circumstances, Americans perceive no threat of religious coercion when obligations of office, employment, or social relationships require attendance at a religious funeral service. Such community participation simply does not raise the degree of concern that accompanied the practices in *Lee* or *Santa Fe*. Organizing a delegation from a public office to attend a funeral normally raises no implication that the government, or any of its officials, endorse the religion of the deceased person.

**B.**

Ms. Knudtson also invokes the *Lemon* test's primary effect analysis. In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), the Supreme Court held that government action violates the Establishment Clause if it: (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion. Justice O'Connor later wrote that *Lemon*'s primary effect prong means that government may not communicate a message of religious endorsement or disapproval. *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring). Justice O'Connor's opinion in *Lynch*—articulating the so-called "endorsement test"—is a "legitimate part of *Lemon*'s second prong." *Elmbrook*, 687 F.3d at 850. "Under the 'endorsement' approach, that inquiry is designed to show whether the government is pushing for the adoption of a particular religion." *Mayle*, 891 F.3d at 684. And, critically, we apply the primary effect test—and the endorsement articulation of that test—through the lens of an objectively reasonable observer. *Id.*

Assessed under the endorsement test, Ms. Knudtson's claim again fails. No reasonable observer would conclude that Mr. McMahon's encouraging his staff to attend his mentor's funeral was an endorsement of religion. As we have noted earlier, considering the totality of the circumstances, it is clear that religion did not play any role in Mr. McMahon's request for his staff to attend Mr. Fox's funeral or in Ms. Knudtson's refusal to attend. A reasonable observer would conclude that the encouragement to attend the funeral was related to Mr. McMahon's admiration for Mr. Fox, not a stance on the religious aspects of the funeral service.[13] Thus, Ms. Knudtson's Establishment Clause claim fails under the endorsement test.

## Conclusion

Under either of the analytical approaches proffered by Ms. Knudtson, the same result obtains: there has been no violation of the Establishment Clause. The reason why Ms. Knudtson's claim fails, as the district court astutely realized, is that religion played no part in Mr. McMahon's entreaty to his staff to attend the funeral. At bottom, his dispute with his staff, including Ms. Knudtson, was over the closure of the office. The County's agents never coerced Ms. Knudtson to attend the funeral and certainly never took any action that implicated religion.

---

[13] *Cf. Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 527–29 (7th Cir. 2009) (violation of Establishment Clause when Sherriff *invited* religious group to his office multiple times and allowed the group to convey religious messages to the government-employed staff).

The district court correctly granted summary judgment to the defendants; its judgment is affirmed.

AFFIRMED